Justice Sotomayor
delivered the opinion of the Court.
At the time of petitioner’s conviction and sentence, federal law mandated a minimum 10-year sentence for persons convicted of certain drug offenses, 21 U. S. C. § 841(a), including those involving 50 grams or more of “a mixture or substance . . . which contains cocaine base,” § 841(b)(1)(A)(iii), and a minimum 5-year sentence for offenses involving 5 grams or more of the same, §841(b)(1)(B)(iii). This case requires us to decide whether the term “cocaine base” as used in this statute refers generally to cocaine in its chemically basic form or exclusively to what is colloquially known as “crack cocaine.” We conclude that “cocaine base” means the former.
I
A
As a matter of chemistry, cocaine is an alkaloid with the molecular formula C17H21N04. Webster’s Third New International Dictionary 434 (2002). An alkaloid is a base— that is, a compound capable of reacting with an acid to form *73 a salt.[1] Id., at 54, 180; see also Brief for Individual Physicians and Scientists as Amici Curiae 2-8 (hereinafter Physicians Brief). Cocaine is derived from the coca plant native to South America. The leaves of the coca plant can be processed with water, kerosene, sodium carbonate, and sulfuric acid to produce a pastelike substance. R. Weiss, S. Mirin, & R. Bartel, Cocaine 10 (2d ed. 1994). When dried, the resulting “coca paste” can be vaporized (through the application of heat) and inhaled, i. e., “smoked.” See United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy 11-12 (1995) (hereinafter Commission Report). Coca paste contains C17H21N04 — that is, cocaine in its base form.
Dissolving coca paste in water and hydrochloric acid produces (after several intermediate steps) cocaine hydrochloride, which is a salt with the molecular formula C17H22N04+C1'. Id., at 12; Physicians Brief 3. Cocaine hydrochloride, therefore, is not a, base. It generally comes in powder form, which we will refer to as “powder cocaine.” It is usually insufflated (breathed in through the nose), though it can also be ingested or diluted in water and injected. Because cocaine hydrochloride vaporizes at a much higher temperature than chemically basic cocaine (at which point the cocaine molecule tends to decompose), it is generally not smoked. See Commission Report 11, n. 15, 12-13.
Cocaine hydrochloride can be converted into cocaine in its base form by combining powder cocaine with water and a base, like sodium bicarbonate (also known as baking soda). Id., at 14. The chemical reaction changes the cocaine hydrochloride molecule into a chemically basic cocaine molecule, *74 Physicians Brief 4, and the resulting solid substance can be cooled and broken into small pieces and then smoked, Commission Report 14. This substance is commonly known as “crack” or “crack cocaine.”[2] Alternatively, powder cocaine can be dissolved in water and ammonia (also a base); with the addition of ether, a solid substance — known as “freebase”— separates from the solution, and can be smoked. Id., at IS. As with crack cocaine, freebase contains cocaine in its chemically basic form. Ibid.
Chemically, therefore, there is no difference between the cocaine in coca paste, crack cocaine, and freebase — all are cocaine in its base form. On the other hand, cocaine in its base form and in its salt form (i. e., cocaine hydrochloride) are chemically different, though they have the same active ingredient and produce the same physiological and psychotropic effects. See id., at 14-22. The key difference between them is the method by which they generally enter the body; smoking cocaine in its base form — whether as coca paste, freebase, or crack cocaine — allows the body to absorb the active ingredient quickly, thereby producing a shorter, more intense high than obtained from insufflating cocaine hydrochloride. Ibid.; see generally Kimbrough v. United States, 552 U. S. 85, 94 (2007).
B
In 1986, increasing public concern over the dangers associated with illicit drugs — and the new phenomenon of crack cocaine in particular — prompted Congress to revise the penalties for criminal offenses involving cocaine-related substances. See id., at 95-96. At the time, federal law generally tied the penalties for drug offenses to both the type of drug and the quantity involved, with no provision for mandatory minimum sentences. See, e. g., § 841(b)(1) (1982 ed., Supp. III). After holding several hearings specifically ad *75 dressing the emergence of crack cocaine, Congress enacted the Anti-Drug Abuse Act of 1986 (ADAA), 100 Stat. 3207, which provided mandatory minimum sentences for controlled-substance offenses involving specific quantities of drugs.
As relevant here, the ADAA provided a mandatory 10-year sentence for certain drug offenses involving 6 kilograms or more of “a mixture or substance containing a detectable amount of” various cocaine-related elements, including coca leaves, cocaine, and cocaine salts; it also called for the same sentence for offenses involving only 50 grams or more of “a mixture or substance . . . which contains cocaine base.” §1002, id., at 3207-2 (amending §§841(b)(1)(A)(ii)-(iii)) (emphasis added). The ADAA also stipulated a mandatory 5-year sentence for offenses involving 500 grams of a mixture or substance containing coca leaves, cocaine,- and cocaine salts, or 5 grams of a mixture or substance containing “cocaine base.” Id., at 3207-3 (amending §§ 841(b)(1)(B) (ii)-(iii)).
Thus, the ADAA established a 100-to-l ratio for the threshold quantities of cocaine-related substances that triggered the statute’s mandatory minimum penalties. That is, 5 grams or more of “a mixture or substance . . . which contains cocaine base” was penalized as severely as 100 times that amount of the other cocaine-related elements enumerated in the statute. These provisions were still in effect at the time of petitioner’s conviction and sentence.[3] See §§841(b)(1)(AMB) (2000 ed. and Supp. Y).
The United States Sentencing Commission subsequently promulgated Sentencing Guidelines for drug-trafficking of *76 fenses. Under the Guidelines, the offense levels for drug crimes are tied to the drug type and quantity involved. See United States Sentencing Commission, Guidelines Manual §2D1.1(c) (Nov. 2010) (USSG). The Commission originally adopted the ADAA’s 100-to-1 ratio for offenses involving “cocaine” and “cocaine base,” though instead of setting only two quantity thresholds, as the ADAA did, the Guidelines “set sentences for the full range of possible drug quantities.” Commission Report 1; see generally Kimbrough, 552 U. S., at 96-97.[4]
The original version of §2Dl.l(c) did not define “cocaine base” as used in that provision, but in 1993 the Commission issued an amendment to explain that “ ‘[e]ocaine base,’ for the purposes of this guideline, means ‘crack/ ” that is, “the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form.” USSG App. C, Arndt. 487 (effective Nov. 1,1993); see also §2D1.1(c), n. (D). The Commission noted that “forms of cocaine base other than crack (e. g., coca paste . . . ) will be treated as cocaine.” App. C, Arndt. 487.[5]
C
Tn April 2005, petitioner Frantz DePierre sold two bags of drugs to a Government informant. DePierre was subsequently indicted on a charge of distributing 50 grams or more *77 of cocaine base under §§ 841(a)(1) and (b)(1)(A)(iii).[6] At trial, a Government chemist testified that the substance in the bags, which weighed 55.1 grams, was “cocaine base.” Tr. 488, 490. She was not able to identify any sodium bicarbonate. Id., at 499. A police officer testified that the substance in question was “off-white [and] chunky.” Id., at 455.
DePierre asked the District Court to instruct the jury that, in order to find him guilty of distribution of cocaine base, it must find that his offense involved “the form of cocaine base known as crack cocaine.” App. in No. 08-2101 (CAI), p. 43. His proposed jury instruction defined “crack” identically to the Guidelines definition. See id., at 43-44; see also USSG §2D1.1(c), n. (D). In addition, DePierre asked the court to instruct the jury that “[c]hemical analysis cannot establish a substance as crack because crack is chemically identical to other forms of cocaine base, although it can reveal the presence of sodium bicarbonate, which is usually used in the processing of crack.” App. in No. 08-2101, at 44.
The court, however, instructed the jury that “the statute that’s relevant asks about cocaine base. Crack cocaine is a form of cocaine base, so you’ll tell us whether or not what was involved is cocaine base ....” Tr. 585 (paragraph break omitted). The jury form asked whether the offense involved “over 50 grams of cocaine base.” App. to Pet. for Cert. 17a. The jury found DePierre guilty of distributing 50 grams or more of cocaine base, and the court sentenced DePierre to 120 months in prison as required by the statute.
The United States Court of Appeals for the First Circuit affirmed, rejecting DePierre’s argument that § 841(b) (l)(A)(iii) should be read only to apply to offenses involving crack cocaine. 599 F. 3d 25, 30-31 (2010). While noting the division on this question among the Courts of Ap *78 peals, ibid., and nn. B, 4, the First Circuit adhered to its own precedent and “read the statute according to its terms,” holding that “‘cocaine base’ refers to ‘all forms of cocaine base, including but not limited to crack cocaine.’” Id., at 30-31 (quoting United States v. Anderson, 452 F. 3d 66, 86-87 (CA1 2006)). We granted certiorari to resolve the longstanding division in authority among the Courts of Appeals on this question. 562 U. S. 960 (2010).
II
A
We begin with the statutory text. See United States v. Ron Pair Enterprises, Inc., 489 U. S. 235, 241 (1989). Section 841(b)(1)(A) provides a mandatory 10-year minimum sentence for certain drug offenses involving
“(ii) 5 kilograms or more of a mixture or substance containing a detectable amount of—
“(I) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;
“(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;
“(III) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or
“(IV) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III); [or]
“(iii) 50 grams or more of a mixture or substance described in clause (ii) which contains cocaine base.”[7]
*79 We agree with the Government that the most natural reading of the term “cocaine base” is “cocaine in its base form” — i. e., C17H21N04j the molecule found in crack cocaine, freebase, and coca paste. On its plain terms, then, “cocaine base” reaches more broadly than just crack cocaine. In arguing to the contrary, DePierre asks us to stray far from the statute’s text, as the term “crack cocaine” appears nowhere in the ADAA (or the United States Code, for that matter). While the Government’s reading is not without its problems,[8] that reading follows from the words Congress chose to include in the text. See United States v. Rodriquez, 553 U. S. 377, 384 (2008) (eschewing an interpretation that was “not faithful to the statutory text”). In short, the term “cocaine base” is more plausibly read to mean the “chemically basic form of cocaine,” Brief for United States 15, than it is “crack cocaine,” Brief for Petitioner 24, 28.[9]
We agree with DePierre that using the term “cocaine base” to refer to C17H21N04 is technically redundant; as noted earlier, chemically speaking cocaine is a base. If Congress meant in clause (iii) to penalize more severely offenses *80 involving “a mixture or substance . . . which contains” cocaine in its base form it could have simply (and more correctly) used the word “cocaine” instead. But Congress had good reason to use “cocaine base” in the ADAA — to distinguish the substances covered by clause (iii) from other cocaine-related substances. For example, at the time Congress enacted the statute, the word “cocaine” was commonly used to refer to cocaine hydrochloride, i e., powder cocaine. See, e. g, United States v. Montoya de Hernandez, 473 U. S. 531, 536, 544 (1985) (repeatedly referring to cocaine hydrochloride as “cocaine”); “Crack” Cocaine, Hearing before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 99th Cong., 2d Sess., 94 (1986) (hereinafter Crack Cocaine Hearing) (prepared statement of David L. Westrate, Assistant Administrator, Drug Enforcement Admin., Dept, of Justice) (discussing production of “a white, crystalline powder, cocaine hydrochloride, otherwise known simply as cocaine”).
To make things more confusing, in the scientific and medical literature the word “cocaine” is often used to refer to all cocaine-related substances, including powder cocaine. See, e. g., J. Fay, The Alcohol/Drug Abuse Dictionary and Encyclopedia 26-27 (1988); Weiss et al., Cocaine, at 15-25; R. Lewis, Hawley’s Condensed Chemical Dictionary 317 (15th ed. 2007). Accordingly, Congress’ choice to use the admittedly redundant term “cocaine base” to refer to chemically basic cocaine is best understood as an effort to make clear that clause (iii) does not apply to offenses involving powder cocaine or other nonbasic cocaine-related substances.
B
Notwithstanding DePierre’s arguments to the contrary, reading “cocaine base” to mean chemically basic cocaine is also consistent with §841(b)(1)’s somewhat confounding structure. DePierre is correct that the interpretation we adopt today raises the question why Congress included the *81 word “cocaine” in subclause (II) of clause (ii). That sub-clause lists “cocaine, its salts, optical and geometric isomers, and salts of isomers” as elements subject to clause (ii)'s higher quantity threshold. §§ 841(b)(1)(A)(ii)(II), (B)(ii)(II) (emphasis added). If, as we conclude, the terms “cocaine” and “cocaine base” both mean chemically basic cocaine, offenses involving a mixture or substance which contains such cocaine will always be penalized according to the lower quantity thresholds of clause (iii), and never the higher quantity thresholds clause (ii) establishes for mixtures and substances containing “cocaine.”[10]
While this much is true, we do not agree with DePierre that the word “cocaine” in subclause (II) is therefore superfluous. For without the word “cocaine” subclause (II) makes no sense: It would provide a minimum sentence for offenses involving a specified quantity of simply “its salts, optical and geometric isomers, and salts of isomers.” In light of the structure of the subclause, the word “cocaine” is needed as the reference point for “salts” and “isomers.”
The word “cocaine” in subclause (II) also performs another critical function. Clause (iii) penalizes offenses involving “a mixture or substance described in clause (ii) which contains cocaine base.” §§841(b)(1)(A)(iii), (B)(iii) (emphasis added). In other words, clause (ii) imposes a penalty for offenses involving cocaine-related substances generally, and clause (iii) imposes a higher penalty for a subset of those substances — the ones that “contai[n] cocaine base.” For this structure to work, however, § 841(b)(1) must “describ[e] in clause (ii)” substances containing chemically basic cocaine, which then comprise the subset described in clause (iii). If *82 such substances were not present in clause (ii), clause (iii) would only apply to substances that contain both chemically basic cocaine and one of the other elements enumerated in clause (ii). Presumably, the result would be that clause (iii) would not apply to crack cocaine, freebase, or coca paste offenses, as there is no indication that, in addition to “cocaine base” (i. e., C17H21N04), those substances contain cocaine “salts” (e. g., cocaine hydrochloride), ecgonine, or any of the other elements enumerated in clause (ii). In short, the exclusion of “cocaine” from clause (ii) would result in clause (iii) effectively describing a null set, which obviously was not Congress’ intent.
Of course, this redundancy could have been avoided by simply drafting clause (iii) to penalize offenses involving “a mixture or substance which contains cocaine base,” without reference to clause (ii) — that is, Congress could have drafted clause (iii) to specify a separate set of cocaine-related substances, not a subset of those in clause (ii). That we may rue inartful legislative drafting, however, does not excuse us from the responsibility of construing a statute as faithfully as possible to its actual text.[11] And as noted earlier, there *83 is no textual support for DePierre’s interpretation of “cocaine base” to mean “crack cocaine.”
We also recognize that our reading of “cocaine” in sub-clause (II) and “cocaine base” in clause (iii) to both refer to chemically basic cocaine is in tension with the usual rule that “when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.” Sosa v. Alvarez-Machain, 542 U. S. 692, 711, n. 9 (2004) (internal quotation marks omitted). However, because “Congress sometimes uses slightly different language to convey the same message,” Deal v. United States, 508 U. S. 129, 134 (1993) (internal quotation marks omitted), we must be careful not to place too much emphasis on the marginal semantic divergence between the terms “cocaine” and “cocaine base.” As we have already explained, Congress had good reason to employ the latter term in clause (iii), and the slight inconsistency in nomenclature is insufficient reason to adopt DePierre’s interpretation: Cf. Public Lands Council v. Babbitt, 529 U. S. 728, 746-747 (2000) (suggesting that a “statute’s basic purpose” might support the conclusion that “two sets of different words mean the same thing”).
III
DePierre offers four additional arguments in support of his view that the term “cocaine base” in clause (iii) is best read to mean “crack cocaine.” We do not find them convincing.
A
DePierre first argues that we should read “cocaine base” to mean “crack cocaine” because, in passing the ADAA, Congress in 1986 intended to penalize crack cocaine offenses more severely than those involving other substances containing C17H21N04 As is evident from the preceding discussion, this position is not supported by the statutory text. To be sure, the records of the contemporaneous congressional hear *84 ings suggest that Congress was most concerned with the particular dangers posed by the advent of crack cocaine. See, e. g., Crack Cocaine Hearing 1 (statement of Chairman Roth) (“[We] mee[t] today to examine a frightening and dangerous new twist in the drug abuse problem — the growing availability and use of a cheap, highly addictive, and deadly form of cocaine known on the streets as ‘crack’ ”); see generally Commission Report 116-118; Kimbrough, 552 U. S., at 95-96.
It does not necessarily follow, however, that in passing the ADAA Congress meant for clause (iii)’s lower quantity thresholds to apply exclusively to crack cocaine offenses. Numerous witnesses at the hearings testified that the primary reason crack cocaine was so dangerous was because— contrary to powder cocaine — cocaine in its base form is smoked, which was understood to produce a faster, more intense, and more addictive high than powder cocaine. See, e. g., Crack Cocaine Hearing 20 (statement of Dr. Robert Byck, Yale University School of Medicine) (stating that the ability to inhale vapor “is the reason why crack, or cocaine free-base, is so dangerous”). This is not, however, a feature unique to crack cocaine, and freebase and coca paste were also acknowledged as dangerous, smokeable forms of cocaine. See, e. g., id., at 70 (prepared statement of Dr. Charles R. Schuster, Director, National Institute on Drug Abuse) (reporting on the shift from snorting powder cocaine to “newer more dangerous routes of administration, such as freebase smoking”); id., at 19-20 (statement of Dr. Byck) (describing the damaging effects of cocaine smoking on people in Peru).
Moreover, the testimony of witnesses before Congress did not clearly distinguish between these base forms of cocaine; witnesses repeatedly used terms like “cocaine base,” “freebase,” or “cocaine freebase” in a manner that grouped crack cocaine with other substances containing chemically basic forms of cocaine. See, e. g., Trafficking and Abuse of “Crack” in New York City, Hearing before the House Select Committee on Narcotics Abuse and Control, 99th Cong., 2d *85 Sess., 258 (1986) (statement of Robert M. Stutman, Special Agent in Charge, Drug Enforcement Admin., Dept, of Justice) (“[C]ocaine in its alkaloid form [is] commonly known on the street as crack, rock, base, or freebase”); Crack Cocaine Hearing 71 (statement of Dr. Schuster) (“In other words, 'crack’ is a street name for cocaine freebase”). In fact, prior to passage of the ADAA, multiple bills were introduced in Congress that imposed enhanced penalties on those who trafficked in “cocaine base,” e. g., S. 2787, 99th Cong, 2d Sess., § 1 (1986), as well as “cocaine freebase,” e. g., H. R. 5394, 99th Cong., 2d Sess., § 101 (1986); H. R. 5484, 99th Cong, 2d Sess., § 608(a) (1986).
Given crack cocaine’s sudden emergence and the similarities it shared with other forms of cocaine, this lack of clarity is understandable, as is Congress’ desire to adopt a statutory term that would encompass all forms. Congress faced what it perceived to be a new threat of massive scope. See, e. g., Crack Cocaine Hearing 4 (statement of Sen. Nunn) (“[C]o-caine use, particularly in the more pure form known as crack, is at near epidemic proportions”); id., at 21 (statement of Dr. Byck) (“We are dealing with a worse drug . . . than we have ever dealt with, or that anybody has ever dealt with in history”). Accordingly, Congress chose statutory language broad enough to meet that threat. As we have noted, “statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils.” Oncale v. Sundowner Offshore Services, Inc., 523 U, S. 75, 79 (1998). In the absence of any indication in the statutory text that Congress intended only to subject crack cocaine offenses to enhanced penalties, we cannot adopt DePierre’s narrow construction. See Lewis v. Chicago, 560 U. S. 205, 215 (2010) (“It is not for us to rewrite [a] statute so that it covers only what we think is necessary to achieve what we think Congress really intended”).
B
DePierre also argues that we should read the term “cocaine base” to mean “crack cocaine,” rather than chemically *86 basic cocaine, because the latter definition leads to an absurd result. Cf. EEOC v. Commercial Office Products Co., 486 U. S. 107, 120 (1988) (plurality opinion). He contends that, because coca leaves themselves contain cocaine, under the Government's approach an offense involving 5 grams of coca leaves will be subject to the 5-year minimum sentence in § 841(b)(1)(B)(iii), even though those leaves would produce only 0.05 grams of smokeable cocaine. See Brief for Petitioner 41-42. While we agree that it would be questionable to treat 5 grams of coca leaves as equivalent to 500 grams of powder cocaine for minimum-sentence purposes, we are not persuaded that such a result would actually obtain in light of our decision today.
To begin with, it is a matter of dispute between the parties whether coca leaves in their natural, unprocessed form actually contain chemically basic cocaine. Compare Brief for Petitioner 15, 17, n. 10, with Brief for United States 43. Even assuming that DePierre is correct as a matter of chemistry that coca leaves contain cocaine in its base form,[12] see Physicians Brief 2, 11, the Government has averred that it “would not be able to make that showing in court,” Tr. of Oral Arg. 28, and that “coca leaves should not be treated as containing ‘cocaine base’ for purposes of Clause (iii),” Brief for United States 45.
It is unsurprising, therefore, that the Government in its brief disclaimed awareness of any prosecution in which it had sought, or the defendant had received, a statutory-minimum sentence enhanced under clause (iii) for an offense involving coca leaves. Id., at 44. And although this question is not before us today, we note that Congress’ deliberate choice to enumerate “coca leaves” in clause (ii) strongly indicates its intent that offenses involving such leaves be subject to the higher quantity thresholds of that clause. Accordingly, *87 there is little danger that the statute will be read in the “absurd” manner DePierre fears.
C
In addition, DePierre suggests that because the Sentencing Commission has, since 1993, defined “cocaine base” to mean “crack” for the purposes of the Federal Sentencing Guidelines, we should do the same with respect to § 841(b)(1). We do not agree. We have never held that, when interpreting a term in a criminal statute, deference is warranted to the Sentencing Commission’s definition of the same term in the Guidelines. Cf. Neal v. United States, 516 U. S. 284, 290-296 (1996). And we need not decide now whether such deference would be appropriate, because the Guidelines do not purport to interpret § 841(b)(1). See USSG § 2D1.1(c), n. (D) (“ ‘Cocaine base,’ for the ‘purposes of this guideline, means ‘crack’ ” (emphasis added)).[13]
We recognize that, because the definition of “cocaine base” in clause (iii) differs from the Guidelines definition, certain sentencing anomalies may result. For example, an offense involving 5 grams of crack cocaine and one involving 5 grams of coca paste both trigger a minimum 5-year sentence under § 841(b)(1)(B)(iii). But defendants convicted of offenses involving only 4 grams of each substance — which do not trigger the statutory mínimums — would likely receive different sentences, because of the Guidelines’ differential treatment of those substances with respect to offense level.[14] Compare *88 USSG §2D1.1(c)(9) (providing an offense level of 22 for at least 4 grams of “cocaine base,” i. e., “crack”) with §2D1.1(c)(14) (providing an offense level of 12 for less than 25 grams of “cocaine,” which, under the Guidelines, includes coca paste). As we have noted in previous opinions, however, such disparities are the inevitable result of the dissimilar operation of the fixed minimum sentences Congress has provided by statute and the graduated sentencing scheme established by the Guidelines. See Kimbrough, 552 U. S., at 107-108; Neal, 516 U. S., at 291-292. Accordingly, we reject DePierre’s suggestion that the term “cocaine base” as used in clause (iii) must be given the same definition as it has under the Guidelines.
D
Finally, DePierre argues that, because § 841(b)(1) is at the very least ambiguous, the rule of lenity requires us to interpret the statute in his favor. See United States v. Santos, 553 U. S. 507, 514 (2008) (plurality opinion) (“The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them”). As evinced by the preceding discussion, we cannot say that the statute is crystalline. The rule, however, is reserved for cases where, “after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute.” Smith v. United States, 508 U. S. 223, 239 (1993) (internal quotation marks and brackets omitted). Applying the normal rules of statutory construction in this case, it is clear that Congress used the term “cocaine base” in clause (iii) to penalize more severely not only offenses involving “crack cocaine,” but those involving substances containing chemically basic cocaine more generally. There is no persuasive justification for reading the statute otherwise. Because the statutory text *89 allows us to make far more than “a guess as to what Congress intended,” Reno v. Koray, 515 U. S. 50, 65 (1995) (internal quotation marks omitted), the rule of lenity does not apply in DePierre’s favor.
* * *
We hold that the term “cocaine base” as used in § 841(b)(1) means not just “crack cocaine,” but cocaine in its chemically basic form. We therefore affirm the judgment of the Court of Appeals.

It is so ordered.

 There are more detailed theories of how acids and bases intprart For our purposes, j.t is sufficient to note the fundamental proposition that a baso and an aeid can combine to form a calt, and all three are different types of compounds. See generally Brief for Individual Physicians and Scientists ac Amici Curiao 8; A Dictionary of Chemistry 6-7, 62- 63, 196 (J. Daintith ed., 5th ed. 2004).

 Though the terms “crack” and “crack cocaine” are interchangeable, in this opinion wc adopt DcPicrrc’c practice and generally employ the latter.

 Duo to a recent amendment, the quantity ratio in § 841(b)(1) is now roughly 18 to 1, but otherwise the relevant statutory provisions are unchanged from those in effect at the time DePierre was sentenced. See Fair Sentencing Act of 2010, §2, 124 Stat. 2372 (changing the quantity in § 841(b)(1)(A)(iii) from 50 to 280 grams and in subparagraph (B)(iii) from 5 to 28 grams).

 In 2007, the Commission increased the quantity of cocaine base required to trigger each offense level, reducing the cocaine-base-to-eocaine-sentencing ratio under the Guidelines. See USSG Supp. App. C, Arndt. 706 (effective Nov. 1, 2007). Unless otherwise noted, we cite to the current versions of the relevant Guidelines provisions.

 The Guidelines’ Drug Quantity Table only lists “cocaine” and “cocaine base” among ito enumerated controlled eubstances, but the application notes make clear that the term “cocaine” includes “eegonine and coca leaves,” as well as “salts, isomers, [and] salts of isomers” of cocaine. §2D1.1(c), and comment., n. 5.

 DePierre was also indicted for diotribution of powder cocaine under § 841(a)(1) and possession of a firearm with an obliterated serial number under 18 U. S. C. § 922(k). He was convicted by jury of the former offense and pleaded guilty to the latter prior to trial.

 As noted earlier, § 841(b)(1)(B) calls for a mandatory minimum 5-year acntcnco for offenses involving exactly the same substances; the only difference in subparagraph (B) is that the threshold quantity in clause (ii) is 500 grams, and in clause (iii) it is 5 grams. Because the 100-to-1 ratio is a feature of both §§ 841(b)(1)(A) and (B), and those subparagraphs are identical in all other respecta, throughout thio opinion wo use the terms “clause (ii)” and “clause (iii)” to refer to those clauses as present in either subparagraph.

 The Government urges us to give “cocaine base” its “settled, unambiguous scientific meaning,” i. e., “the form of cocaine classified chemically as a base, with the chemical formula C17H21N04 and a particular molecular structure.” Brief for United States 20; cf. McDermott Int’l, Inc. v. Wilander, 498 U. S. 337, 342 (1991) (“In the absence of contrary indication, we assume that when a statute uses ... a term [of art], Congress intended it to have its established meaning”). But the scientifically proper appellation for C17H21N04 is “cocaine” tout court, and the Government cites no source that uses “cocaine base” to refer to C17H21N04 (save lower court opinions construing the statute at issue in this case). Therefore, there is no “settled meaning” — scientific or otherwise — of “cocaine base” for us to apply to § 841(b)(1).

 The statute itself gives us good reason to reject DePierre’s reading. Substituting “crack cocaine” for “cocaine base” would mean that clause (iii) only applies to a “mixture or substance . . . which contains [crack cocaine].” But crack cocaine is itself a “substance” involved in drug offenses; it is the end product that is bought, sold, and consumed. We are aware of no substance that “contains” crack cocaine.

 DePierre makes a similar argument with respect to coca lcavco: Because they contain chemically basic cocaine, he contends, under the Government’s interpretation offenses involving coca leaves will never be subject to the lower quantity threshold associated with subelause (I), rendering that provision superfluous. For reasons discussed later, see infra, at 85-87, we are not convinced.

 At the time the ADA A was enacted, the definition of “narcotic drug” in the same subchapter of the United States Code included, as relevant, the following:
“(C) Coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed.
“(D) Cocaine, its salts, optical and geometric isomers, and salts of isomers.
“(E) Ecgonine, its derivatives, their salts, isomers, and salts of isomers.
“(F) Any compound, mixture, or preparation which contains any quantity of any of the substances referred to in [the preceding] subpara-graphs _” 21 U. S. C. §802(17) (1982 ed., Supp. III).
Accordingly, the likely explanation for the ADAA’s curious structure is that Congress simply adopted this pre-existing enumeration of cocaine-related controlled substances, and then engrafted clause (iii) to provide enhanced penalties for the subset of offenses involving chemically basic cocaine.

 It appears that Congress itself is of the view that coca leaves contain “cocaine,” as subclause (I) exempts offenses involving “coca leaves from which cocaine ... ha[s] been removed.” §§841(b)(1)(A)(ii)(I), (B)(ii)(I).

 We also disagree with DePierre’s contention that Congress’ failure to reject the Guidelines definition of “cocaine base” means that it has effectively adopted that interpretation with respect to the statute. See Kimbrough v. United States, 552 U. S. 85, 106 (2007) (“Ordinarily, we resist reading congressional intent into congressional inaction”).

 In defining “cocaine base” as “crack,” the Commission explained that “forms of cocaine base other than crack” are treated as “cocaine" for purposes of the Guidelines. USSG App. C, Arndt. 487 (effective Nov. 1,1998). This includes coca paste, which the Commission described as “an intermediate step in the processing of coca leaves into cocaine hydrochlo *88 ride.” Ibid. As we have explained, however, coca paste is a smokeable form of cocaine in its own right, and we see no reason why, as a statutory matter, it should be subject to lesser penalties than crack or freebase.