Sheldon **HARGROVE** and Ronald Johnson, Appellants,

v.

**UNITED STATES, Appellee.**

Nos. 10–CF–1013, 11–CF–6.

District of Columbia Court of Appeals.

Argued Oct. 31, 2012.

Decided Nov. 15, 2012.

Ian A. Williams, Washington, DC, for appellant Hargrove.

Craig N. Moore, Providence, RI, for appellant Johnson.

Suzanne C. Nyland, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and John P. Mannarino, Bryan Seeley, and Adam B. Schwartz, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, FISHER, Associate Judge, and FARRELL, Senior Judge.

FARRELL, Senior Judge:

A jury found appellant Ronald Johnson guilty of assault with a dangerous weapon (ADW), threats, and related firearms offenses, and appellant Sheldon Hargrove guilty of carrying a pistol without a license (CPWL) and other firearms offenses. Hargrove, a retired Metropolitan Police Department (MPD) police officer, contends mainly that the trial judge erred in refusing to allow him to raise the statutory defense to CPWL for a retired MPD officer carrying a pistol he has "registered." D.C.Code § 22–4505(b) (2001). Hargrove argues that his registration of the pistol in Maryland met the terms of the statutory exception. Johnson contends that the judge committed plain error by not giving a special unanimity instruction requiring the jury to specify which of three possible assaultive events was the basis for his ADW conviction, and by allowing the prosecutor to make improper statements in rebuttal argument. We affirm as to both defendants.

## I.

■ Johnson's ADW conviction arose from his shooting of Tyrone Hector in late May of 2008, following an argument over money that Hector believed Johnson owed him for work done on Johnson's behalf. Hargrove, according to the evidence, brought to the scene the .380 caliber semiautomatic pistol that Johnson used to shoot Hector.[1] We discuss the relevant facts more fully in treating Johnson's claim of a faulty instruction.

Hargrove had been an MPD officer from 1982 through his retirement in November 2007. After retiring, he worked for a contractor who furnished courtroom marshals for the U.S. Marshals Service in federal district court. In 1997, Hargrove bought and registered in Maryland the .380 caliber semiautomatic pistol at issue in this case. He did not register the pistol in the District of Columbia and had no license to carry it here, but testified that he had believed his status as a retired MPD officer, and the Maryland registration, allowed him to carry it in the District.

Although D.C.Code § 22–4504(a) makes it a crime to "carry within the District of Columbia a pistol[ ] without a license issued pursuant to District of Columbia law," § 22–4505(b) makes that prohibition inapplicable "to a police officer who has retired from the [MPD], if the police officer has registered a pistol and it is concealed on or about the police officer." At trial Hargrove sought to raise this exception in defense to the CPWL charge, over the prosecutor's objection that § 22–4505(b) must be read conjointly with provisions of Title 7 of the D.C.Code ("Firearm

---

1. By the time of trial, Hargrove was no longer charged with complicity in the shooting, and was convicted of the weapons offenses as a principal, not an aider and abettor of Johnson's possession of the firearm.

Control Regulations") governing the registration of firearms in the District. Those provisions, the prosecutor argued, made Hargrove's registration of the pistol in Maryland beside the point. The trial judge agreed and barred the defense based on the statutory exception.

Hargrove renews the claim of exemption on appeal, pointing to what he says is the plain language of § 22–4505(b) excepting from CPWL's reach a retired MPD officer who "has registered a pistol," *simpliciter*, regardless of in which jurisdiction.[2] We conclude, though, that the exception derives necessary meaning from the cognate provisions of Title 7 governing firearms registration in the District, and that these make Hargrove's position untenable.[3]

Section 22–4505(b) stems from the same enactment by the D.C. Council that, in Title 7 of the D.C.Code, established both the privilege of a retired MPD officer to register and carry a pistol and the limitations on that privilege. The exception was part of the Handgun Possession Amendment Act of 1992,[4] the purpose of which was "to permit officers who have retired from the [MPD] to register and carry a pistol" (1) for their own protection against criminal offenders whom they had confronted while on active duty[5] and (2), so

that based on their "training and experience," they could act as an "additional force on the streets" enhancing public protection by "responding to criminal emergencies that occur in their presence." Report, *supra* note 5, at 2.

Therefore, besides creating the CPWL exception, and to carry out the purpose of allowing retired officers "to register and carry a pistol," *id.*, the 1992 Act amended the registration provisions of Title 7 of the D.C.Code in several related ways. First, new D.C.Code § 7–2502.01(a)(2) (2001) provided that "[a firearm] registration certificate [6] may be issued ... [i]n the discretion of the Chief of Police, to a police officer who has retired from the [MPD]." Second, § 7–2502.02(a), generally prohibiting registration of a pistol, was amended to make the ban inapplicable to "[a] police officer who has retired from the [MPD]." Section 7–2502.02(a)(4)(B). Further, new § 7–2502.07(f) specified that, "[i]n the discretion of the Chief of Police, a registration certificate may be issued to a retired police officer who is a resident of the District of Columbia for a pistol and ammunition which conforms to the [MPD] General Orders and Policies"; but new § 7–2502.07(g) added that, "[w]hen the retired police officer ceases to be a resident of the

**2.** Hargrove makes no claim of exemption from the reach of § 22–4504 by virtue of 18 U.S.C. § 926 C(a) (2012), which permits qualified retired law enforcement officers to carry a concealed firearm "[n]otwithstanding any other provision of the law of any State or any political subdivision thereof" so long as certain prerequisites are met. Through counsel, Hargrove conceded below that at the time of the present incident, Hargrove had not completed the application process under the federal statute.

**3.** Hargrove's suggestion (Br. for App. at 8–9) that his previous registration in the District of a *different* firearm while he was an active duty MPD officer satisfies the registration requirement is frivolous.

**4.** Bill 9–91, Act 2–947, 1992 D.C. Law 9–266 (effective May 7, 1993).

**5.** This was a concern "in the wake of increasing violent and drug-related crime in the District of Columbia." REPORT OF THE COMMITTEE ON THE JUDICIARY ON BILL 9–91 2 (March 1992) ("Report").

**6.** A "registration certificate" is "a certificate validly issued pursuant to this unit [*i.e.*, Unit A, D.C.Code §§ 7–2501.01 through –2508.07] evincing the registration of a firearm pursuant to this unit." D.C.Code § 7–2501.01(13).

District of Columbia the registration certificate expires." Lastly, new § 7–2502.07(h) confirmed that "[n]othing in this unit shall create an entitlement to a registration certificate for a retired police officer."

■■■ As this court has long recognized, statutory provisions *in pari materia* "must be read in light of" one another. *In re L.M.*, 5 A.3d 18, 19 (D.C.2010).

> The correct rule of interpretation is, that if divers [sic] statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them, and it is an established rule of law, that all acts *in pari materia* are to be taken together, as if they were one law.

*United States Parole Comm'n v. Noble*, 693 A.2d 1084, 1087 (D.C.1997), *adopted en banc*, 711 A.2d 85 (D.C.1998) (quoting *United States v. Freeman*, 44 U.S. (3 How.) 556, 564–65, 11 L.Ed. 724 (1845)). The nexus intended between § 22–4505(b)'s exception and Title 7's amended registration provisions is unmistakable.

The latter specify the means of permitting a retired MPD officer "to register and carry" a pistol, but also the preconditions and limitations of the privilege. It is conditioned first by residency—registration expires of its own force on the officer's relocation from the District—and, more importantly, by the discretion invested in the Chief of Police to grant or deny registration to the retired officer. Those limitations cannot be reconciled with a reading of § 22–4505(b) that would bring registration of a pistol anywhere, by whatever licensing authority exercising its own discretion, within the exception of § 22–4505(b). That section, drawing meaning from the statutory company it keeps, follows the historic practice by which "[r]egistration typically required that a person provide to the *local* government a modicum of information about the registrant and his firearm." *Heller v. District of Columbia*, 670 F.3d 1244, 1254 (D.C.Cir. 2011) (emphasis added). We reject appellant's attempt to read it to embrace registration by any government anywhere.[7]

---

7. Hargrove argues that, at the least, enough ambiguity surrounds the meaning of § 22–4505(b) that we should apply the rule of lenity to excuse his carrying of the unregistered pistol. But that rule "is reserved for cases where, 'after seizing everything from which aid can be derived, the Court is left with an ambiguous statute.'" *DePierre v. United States*, ─ U.S. ──, 131 S.Ct. 2225, 2237, 180 L.Ed.2d 114 (2011) (quoting *Smith v. United States*, 508 U.S. 223, 239, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)). Here the "aid ... derived" from reading § 22–4505(b) together with the cognate provisions of Title 7 "allows us to make far more than 'a guess as to what [the Council] intended,' [so] the rule of lenity does not apply in [Hargrove's] favor." *DePierre*, 131 S.Ct. at 2237 (quoting *Reno v. Koray*, 515 U.S. 50, 65, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995)).

Hargrove's additional argument that § 22–4505(b), limited in the way we read it, violates the Second Amendment (or any other constitutional provision) was not raised below

and need not be considered. *See, e.g., In re W.E.P.*, 318 A.2d 286, 289 (D.C.1974). The argument has no merit in any event, certainly when analyzed for unpreserved plain error. *See Gamble v. United States*, 30 A.3d 161, 165–66 (D.C.2011) (holding there is no constitutional right to carry a concealed weapon); *Smith v. United States*, 20 A.3d 759, 764 (D.C. 2011) (rejecting argument that the right to possess a handgun extended beyond the home). *See also Osterweil v. Bartlett*, 819 F.Supp.2d 72, 90 (N.D.N.Y.2011) (upholding, against equal protection and right-to-travel challenges, New York state law requiring residency to obtain permit to possess and carry firearm); *Peterson v. LaCabe*, 783 F.Supp.2d 1167, 1170 (D.Colo.2011) (same, as to Colorado residency requirement to obtain permit to carry concealed handgun); *Peruta v. County of San Diego*, 758 F.Supp.2d 1106, 1119–20 (S.D.Cal.2010) (same, as to San Diego County residency requirement to carry concealed firearm).

## II.

 Rejecting Johnson's claim of self-defense, the jury convicted him of the lesser included offense of ADW, threats, and related weapons offenses. Johnson argues that the trial judge erred in not giving "a special unanimity instruction," *Williams v. United States*, 981 A.2d 1224, 1228 (D.C. 2009), after the jury sent out the following note while deliberating:

> The jury appreciates that several different "assaults" may have occurred during the relative time frame for the charges brought against Mr. Johnson.

> If self-defense is found for the first instance of assault, does that necessitate findings of self-defense for all subsequent instances of assault?

The jury's reference to "different 'assaults'" was based on the government's evidence showing that, after an argument in Johnson's truck over money that Tyrone Hector believed Johnson owed him, Johnson shot Hector twice in the truck, chased him down the street and fired more shots as Hector fled with the truck keys in his hand, then tried to shoot him (no bullets were fired) as Hector lay on the ground bleeding from his wounds. Johnson argues that, without a special instruction responding to the jury's note, a non-unanimous jury may have patched together a single ADW guilty verdict from separate assaults.

 "[W]hen a single count encompasses two (or more) factually separate criminal incidents, the Sixth Amendment requirement of a unanimous verdict obliges the judge to instruct the jury that it must reach unanimous agreement as to a particular incident in order to find the defendant guilty as charged." *Williams*, 981 A.2d at 1228. Unanimity is not required, though, "when the jury is presented with alternative theories of criminal liability for a single incident." *Id.; accord,*

*Schad v. Arizona*, 501 U.S. 624, 631–32, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). Only when "distinct incidents go from being different means of committing the same crime[ ] to being different crimes" is "jury unanimity on the particular incident supporting the verdict [ ] mandated by the Sixth Amendment." *Williams*, 981 A.2d at 1229.

Johnson's argument for reversal suffers initially from his counsel's failure to request a unanimity instruction at anytime. To the contrary, in response to the jury's note he urged the judge to tell the jurors that "there was *one assault* and ... if self-defense was present for the AWIK [assault with intent to kill], then self-defense is present for the lesser included ADW." And, "because we are dealing with *a continuous course of conduct* " (emphasis added), counsel asked that "the [standard] instruction regarding [heat of] passion" be given. Having insisted at trial that the facts be viewed as "one assault," Johnson is in no position to argue the contrary scenario of separate incidents, requiring unanimity as to each. *See Preacher v. United States*, 934 A.2d 363, 368 (D.C. 2007); *Cowan v. United States*, 629 A.2d 496, 502–03 (D.C.1993).

But even reviewing for plain error, the unanimity argument fails. Although the jury's note referred to "several different 'assaults,' " the jury's concern, as the trial judge recognized, was whether Johnson might have forfeited his unitary defense of self-defense by his actions at any point while first shooting Hector in the truck, then chasing him and firing again, and finally attempting to shoot him on the ground. It is anything but "obvious," *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), that the jury was in disagreement over which of these acts had taken place, rather than *sharing* uncertainty over whether self-defense, if found (unanimously) as to

the first, could yet be forfeited in the sequel. It is likewise not obvious that Johnson's actions, all following quickly upon one another, met the factual predicate for a special unanimity instruction. His use of the gun to (1) twice shoot Hector in the chest inside the truck; (2) fire additional shots to, at a minimum, frighten the fleeing Hector to return Johnson's keys; and (3) point the gun at Hector after he collapsed while again threatening to shoot him, bore the earmarks of a single continuous course of action, as Johnson's counsel recognized at trial. *See Simms v. United States*, 634 A.2d 442, 445–46 (D.C. 1993) (no unanimity instruction required to determine which of several events supported armed-robbery conviction where defendants kidnapped and blindfolded victim, stole his van, demanded money while assaulting him over a two-hour period, and then abandoned him and van after stealing tools from van); *State v. Stockmyer*, 83 Wash.App. 77, 920 P.2d 1201, 1205–07 (1996) (no unanimity instruction was required where, claiming self-defense, defendant hit victim in head with gun and then picked up gun and pointed it at victim and others, because these events were part of one continuous course of conduct); *see also Gray v. United States*, 544 A.2d 1255, 1257–58 (D.C.1988) (repeated acts of sexual assault during a single encounter, with "no significant break between the events," constituted "a single course of action"); *Glymph v. United States*, 490 A.2d 1157, 1160–61 (D.C.1985) (multiple assaultive incidents occurring during "a continuous course of assaultive conduct" are not "discrete assaults").

All told, then, Judge Morin correctly answered the jury's note (by stating that "[i]f you find that a defendant acted in self-defense with regard to one use of force, that does not mean you are required to find that the defendant acted in self-defense with regard to a later use of force"), and he was not obliged to give a unanimity instruction neither compelled by the jury's request for guidance nor asked for by Johnson.

## III.

■ Johnson also argues, for the first time on appeal, that the trial judge should have taken corrective action for instances when the prosecutor, in rebuttal argument, disparaged Johnson's testimony as concocted or fabricated and argued supposed facts not in evidence. Because none of these claimed excesses was objected to at trial, we again review only for plain error. *See McGrier v. United States*, 597 A.2d 36, 41 (D.C.1991) ("When there has been no objection at trial, reversal ... based on improper prosecutorial argument is appropriate only in a 'particularly egregious' case, when 'a miscarriage of justice would otherwise result.' ") (citations omitted).

Review of the prosecutor's rebuttal reveals that, in the main, it replied unobjectionably to arguments made by both defense counsel about why Hector's version of the events should be rejected—both as to how Johnson came to possess Hargrove's gun (specifically whether Hargrove had handed it to him) and whether Hector had sufficiently provoked Johnson to shoot him and pursue him down the street still firing in claimed self-defense.[8] At intervals, however, the prosecutor referred to parts of the combined defense as "concocted after the fact" and a "fabrication"

---

8. So, for instance, the prosecutor's argument that Johnson's testimony that he only fired up in the air, not in Hector's direction, as he chased him was "stuff out of the movies" rested mainly on the testimony of eyewitness Officer Johnnie Barnes, who saw Johnson point the gun at Hector and threaten to shoot him if the truck keys weren't returned, and on the implausibility—as the prosecutor saw it—of Johnson's merely firing into the ground or in the air if, as Johnson claimed, Hector

meant to "distract" the jury from what really had happened. We have criticized expressions such as these because, besides suggesting the prosecutor's own belief about the credibility of witnesses, *see Powell v. United States,* 455 A.2d 405, 408–09 (D.C.1982) ("The prosecutor may not publicly cast his vote."), they tend to " 'create[ ] the false issue of the reliability and credibility of counsel,' " *Dyson v. United States,* 450 A.2d 432, 440 (D.C.1982), implying that defense counsel too, in the guise of zealous representation, had been party to falsifying a defense.

These stray expressions, however, and the other uncorrected over-zealousness Johnson alleges in the prosecutor's rebuttal, fall well short of affecting Johnson's substantial rights or creating manifest injustice on this record. From all appearances, the jury carefully weighed the evidence of his guilt and the claim of self-defense,[9] convicting him of ADW and threats but acquitting him of assault with intent to kill while armed and aggravated assault. Moreover, his defense of self-defense was seriously weakened, first, by his admission at trial that he had fired shots as Hector fled in order to frighten him, and his admission to police investigators that he no longer believed Hector was armed after Hector tried to run away; and second, by the testimony of Officer Barnes, whose testimony no one challenged as incredible, that Johnson had threatened to kill Hector while holding the gun to Hector's head.

*Affirmed.*

posed an imminent threat to his life while being chased.

9. Besides the note discussed in part III, *supra,* the jury sent out a note asking for guidance on the meaning of "imminent" as it appeared in the self-defense instruction (*i.e.,* whether Johnson had actually and reasonably "believed he was in imminent danger of bodily harm").