*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-148

MARQUET BRYANT, APPELLANT,

No. 12-CF-389

ROBERT B. HAGOOD, APPELLANT,

v.

UNITES STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF3-22308-10 & CF3-22309-10)

(Hon. Florence Y. Pan, Trial Judge)

(Argued February 19, 2014　　　　　　　　　　Decided June 19, 2014)

*Stefanie Schneider*, Public Defender Service, with whom *James Klein* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant Hagood.

*Christine Pembroke* filed a brief for appellant Bryant.[*]

*Stephen F. Rickard*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, *Elizabeth Trosman*, and *Ephraim Wernick*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, FISHER, *Associate Judge*, and RUIZ, *Senior Judge*.

---

[*] Appellant Bryant chose to submit on the briefs, without oral argument.

RUIZ, *Senior Judge*:  Robert Hagood[1] and Marquet Bryant[2] were convicted after a jury trial of attempted first degree burglary while armed,[3] assault with a dangerous weapon ("ADW"),[4] and related weapons charges:  two counts each of possession of a firearm during the commission of a crime of violence ("PFCV")[5]—one related to the attempted burglary and one to the ADW—as well as one count each of unlawful possession of a firearm[6] and carrying a pistol without a license ("CPWL").[7]  Hagood was also convicted of malicious destruction of property,[8] but Bryant was acquitted of that charge.  Both appellants appeal their convictions alleging that the trial court erred in failing to *sua sponte* give the jury a special unanimity instruction and that their PFCV convictions merge.  Bryant raises additional trial-related claims and challenges the legality of his CPWL conviction. We agree with appellants that a special unanimity instruction should have been

---

[1]  Hagood is also known by the nickname Boo.

[2]  Bryant is also known by the nickname Q.

[3]  D.C. Code §§ 22-801 (a), -4502, -1803 (2001).

[4]  D.C. Code § 22-402 (2001).

[5]  D.C. Code § 22-4504 (b) (2001).

[6]  D.C. Code § 22-4503 (a)(1) (2001).

[7]  D.C. Code § 22-4504 (a) (2001).

[8]  D.C. Code § 22-303 (2001).

given, but conclude that, under plain error review, reversal is not warranted on the facts of their cases. We further conclude that appellants' PFCV convictions merge, and remand the cases so that the trial court may vacate one of those convictions and resentence appellants as the court, in its discretion, may find appropriate. We otherwise affirm the convictions.

**I.**

The government presented evidence that on November 24, 2010, Tiffany Bostic, her children, her boyfriend Jerome Edmonds, her mother Lawana Mays, her sister Taneil Mays, and her stepfather David Marshall, were gathered at Bostic's house in preparation to go to her aunt's house for a Thanksgiving celebration. Edmonds left the apartment to purchase cigarettes. On the way to his car, he passed appellants Bryant and Hagood who were standing with others on the sidewalk outside the apartment building. As Edmonds passed, Hagood said, "Look at this suck ass nigger right here." Edmonds ignored the comment and continued on his way to purchase cigarettes. On his return to the apartment, Edmonds again passed by the group and heard Hagood say, "Look at this bitch ass thing right here." Edmonds confronted Hagood and told him, "If you have something to say to me, you can say it to me; we grown, we're men." At this point, Edmonds

testified, he saw Bryant pull a silver revolver from his waistband and hand it to Hagood.[9]

Seeing the gun, Edmonds began to back up the steps toward the door to Bostic's apartment saying "everything cool, you got it" as a manner of offering a "truce." As Edmonds backed through the door, he and Bostic attempted to close it, but Hagood rushed to the door, threw his shoulder into it to keep it open, and forced his head, arm, and the gun through the open portion. The occupants of the apartment were able to push Hagood out and close the door. They heard a couple of kicks delivered to the door and then a gunshot seconds later. The bullet traveled through the bottom portion of the door and grazed Edmonds's ankle. None of the witnesses saw Bryant at the door. The occupants called 911, but because the call was labeled as a destruction of property complaint, it was not given priority.

Marshall went to shut the blinds on the windows at the back of the apartment soon after the altercation at the front door and saw Hagood, Bryant, and other men standing on the patio below the apartment's balcony. Hagood raised his arm above his head and made a beckoning motion. Marshall responded by drawing his flat

---

[9] Edmonds was impeached on this point by the investigating detective, who testified that Edmonds told her that Hagood pulled the gun out of his own waistband.

right hand from left to right under his chin and around his neck to indicate to Hagood that any chance to explain "was dead, it's too late to explain," and shut the blinds.

A few minutes after this exchange, while the occupants were calling 911 again, appellants returned to the front of the apartment. At that point, Hagood walked in through the front door and said, "What's up?" to Edmonds.[10] Edmonds immediately rushed forward and pinned Hagood against the wall. Meanwhile, Bryant stood at the doorway with the revolver in his hand.[11] Marshall and Lawana Mays pushed Bryant back into the hallway. Bryant then raised the gun above his head and fired once into the ceiling. The occupants retreated inside and Hagood and Bryant departed. When Metropolitan Police Department officers arrived a few minutes later, they encountered a scene where everyone was "very upset." The police recovered a bullet from inside the apartment, but could not recover a bullet

---

[10] The occupants testified that at least some of the three locks on the door were locked after the first altercation. However, Bostic's young son, Amonte, was outside playing during the first incident and returned before the second incident. Bostic testified they had to unlock the door to let him in; she was unsure whether the door was locked after Amonte returned. Given that there was no evidence at trial of damage to the locks on the door, the most reasonable inference is that the door was not locked when appellants came back to the front door.

[11] Edmonds identified the gun produced by the government at trial as the same one held by Hagood during the initial incident and by Bryant during the second incident.

from the hall ceiling. They also recovered a blue hat with a green bill from the hallway in front of the apartment door. Edmonds and Taneil Mays identified the hat at trial as belonging to Hagood.

The police detained Bryant and Hagood a few days later. They were identified by Bostic and Edmonds, and were placed under arrest. The revolver was recovered later from a third party.[12]

At trial, Hagood presented one witness, Michelle Burrell—also known as "Shellie"—who testified that she witnessed Edmonds say something to Hagood in passing, but she denied seeing a gun or restraining Hagood.[13] She stated that she left the apartment complex and while walking to a friend's house heard "like one

---

[12] On December 7, 2010, thirteen days after the shooting, MPD officers recovered a silver revolver discarded by Antoine Queen as he fled from police officers who were conducting a gun interdiction patrol. While Queen was in police custody he stated that he believed the gun had been used in a shooting at Bostic's apartment complex "two to three weeks earlier" and that he had received the gun "approximately two days after the shooting, and he was told to hold onto the gun." Queen was charged with obstruction of justice and tampering with physical evidence, and he was tried in the same proceedings as Hagood and Bryant. The jury acquitted Queen of both charges.

[13] Edmonds testified that a woman named Shellie had tried to grab Hagood to prevent him from pursuing Edmonds with the gun after their verbal confrontation outside the apartment building.

or two shots, and everybody just ran," including Hagood and Bryant. Bryant did not put on any evidence.

Appellants argued in closing that the complaining witnesses had fabricated the entire event. Pointing to inconsistencies in the witnesses' testimony, background conversations on the 911 calls, and the fact that Edmonds was on probation and "can go back to prison if he's found to be involved in gunplay," Bryant argued that the occupants had "a lot of time to sit there and decide what happened, to concoct a story of what they're going to tell the police . . . ." Likewise, Hagood argued that because Edmonds was on probation and did not like Hagood,[14] Edmonds "put whatever happened that night" on Hagood. Neither appellant offered an alternative version of exactly what happened that night, but noted that "something happened" and that the occupants were placing the blame on Hagood and Bryant.

---

[14] Testimony was introduced at trial that Bostic had been having a sexual relationship with Hagood's brother Troy. However, Bostic testified that Edmonds did not know about the relationship. Edmonds denied knowing Troy or about the relationship, and he also denied that Hagood had been making disparaging comments about Bostic as Edmonds passed by him the night of the shootings.

In its final charge before releasing the jury to deliberate, the trial court gave the jury a general unanimity instruction: "In order to return a verdict, each juror must agree on the verdict. In other words, your verdicts must be unanimous." The court did not give a special unanimity instruction that calls the jury's attention to the requirement that they must also be in unanimous agreement with respect to the underlying acts on which their verdict is based.[15]

During deliberations, the trial court received multiple notes from the jury. In one, the jury inquired whether the destruction of property count encompassed only damage to the door, or whether they could include damage to the ceiling as well.

---

[15] The model special unanimity instruction reads:

> [Name of defendant] has been charged with one count of [name of offense]. You have heard evidence of more than one act or incident related to this count. [Describe the separate acts/incidents.] You may find [name of defendant] guilty on this count if the government proves beyond a reasonable doubt that [name of defendant] committed either of these acts/incidents. However, in order to return a guilty verdict on this count, you must all agree that [name of defendant] committed [describe first act/incident] or you must all agree that [name of defendant] committed [describe second act/incident] [repeat if other alternative acts/incidents].

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.406 (5th ed. 2013).

The court instructed the jury that only the damage to the door could be considered because it was the only item listed in the charging document. In another note, the jury inquired whether an acquittal required unanimity as was required for a guilty verdict. The court instructed the jury that they needed to be unanimous to return either a guilty or not guilty verdict.

## II.

Appellants were each charged and convicted of single counts of attempted first-degree burglary while armed, ADW, CPWL, and unlawful possession of a firearm, as well as two counts each of PFCV—one related to the burglary conviction and one to the ADW conviction. On appeal, they contend that the trial court erred in failing to *sua sponte* provide the jury with a special unanimity instruction because the jury's verdict of guilty on each of the counts could have been grounded on either of the two incidents at the door of Bostic's apartment. Because neither appellant requested a special unanimity instruction at trial we review for plain error. *See Wynn v. United States*, 48 A.3d 181, 192 (D.C. 2012). Under plain error review, it is appellant's burden to show error that is clear or obvious and that affected their substantial rights. *See, e.g.*, *Guevara v. United States*, 77 A.3d 412, 418 (D.C. 2013). If such a showing is made, the court may exercise its discretion to reverse if the error "seriously affect[s] the fairness,

integrity or public reputation of judicial proceedings." *E.g.*, *Wheeler v. United States*, 930 A.2d 232, 242 (D.C. 2007) (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

Where a single charge "encompasses two separate incidents," the Sixth Amendment requires that "the judge must instruct the jury that if a guilty verdict is returned the jurors must be unanimous as to which incident or incidents they find the defendant guilty." *Scarborough v. United States*, 522 A.2d 869, 871 (D.C. 1987) (en banc) (quoting *Hawkins v. United States*, 434 A.2d 446, 449 (D.C. 1981)). A special unanimity instruction protects the right to a jury trial by guarding against "the possibility that some jurors might vote to convict based solely on one incident while others vote to convict solely based on the other." *Id.*; *see also Schad v. Arizona*, 501 U.S. 624, 651 (1991) (Scalia, J., concurring); *Johnson v. United States*, 398 A.2d 354, 369 (D.C. 1979). The instruction also serves to "effectuate the reasonable doubt standard" by ensuring that each juror is convinced beyond a reasonable doubt that the government has proved each element of the offense. *Scarborough*, 522 A.2d at 872 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)). The instruction accomplishes this by telling jurors that they are required "to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime

charged." *Owens v. United States*, 497 A.2d 1086, 1092-93 (D.C. 1985). It should be given when "distinct incidents go from being different means of committing the same crime[] to being different crimes." *Hargrove v. United States*, 55 A.3d 852, 857 (D.C. 2012) (alteration in original) (quoting *Williams v. United States*, 981 A.2d 1224, 1228 (D.C. 2009)). The failure to give a special unanimity instruction when required is error that is clear for the purpose of plain error review. *See Wynn*, 48 A.3d at 193; *Scarborough*, 522 A.2d at 871-72; *see also Youssef v. United States*, 27 A.3d 1202, 1208 (D.C. 2011) (holding that trial court erred in denying defendant's request for special unanimity instruction).

A special unanimity instruction is not required, on the other hand, where the jury is presented "with alternative theories of criminal liability for a single incident," *Hargrove*, 55 A.3d at 857, or "when a single count is charged and the facts show a continuing course of conduct, rather than a succession of clearly detached incidents." *Gray v. United States*, 544 A.2d 1255, 1258 (D.C. 1988). In *Gray*, we identified a number of factors that have been used to determine whether a course of conduct was factually[16] a single incident or separate, distinct incidents.

---

[16] A special unanimity instruction is also required where there are *legally* separate incidents. *See Scarborough*, 522 A.2d at 873. In *Gray*, we explained that legally separate incidents arise "when the appellant presents different defenses to separate sets of facts underlying the charge . . . or when the court's instructions are

(continued . . .)

We articulated that incidents have been deemed to be factually separate: (1) when the "acts have occurred at different times and were separated by intervening events," (2) when they occurred in different places, (3) "when the defendant has reached a fork in the road and has decided to invade a different interest," or (4) "when the first act has come to an end and the next act is motivated by a fresh impulse." *Id.* at 1257.

We pause here to clarify that while these factors may be of use, they are not dispositive. *See Scarborough*, 552 A.2d at 873 ("In short, the unanimity issue under a single count of an information or indictment does not turn only on whether separate criminal acts occurred at separate times (although in some cases it may); it turns, more fundamentally, on whether each act alleged under a single count was a separately cognizable incident—by reference to separate allegations and/or to separate defenses—whenever it occurred."). Instead, they offer guideposts in resolving the central question in determining whether a special unanimity instruction was required: whether a reasonable jury "must have" agreed upon one

---

(. . . continued)
ambiguous but tend to shift the legal theory from a single incident to two separate incidents. 544 A.2d at 1257-58 (internal citations omitted); *see also Guevara*, 77 A.3d at 419, 421 (discussing cases). We are concerned in this appeal only with factually different incidents. *See Wynn*, 48 A.3d at 193 n.17; *Williams*, 981 A.2d at 1230 n.26.

particular set of facts as the factual predicate for the verdict or whether some jurors "could have" believed one set of facts while other jurors could have believed another. *See Simms v. United States*, 634 A.2d 442, 445 (D.C. 1993) ("The requirement for a special unanimity instruction arises when the court cannot deduce from the record whether the jury must have agreed upon one particular set of facts."); *Scarborough*, 522 A.2d at 873 ("Properly framed, then, the question is whether, on this record, some jurors reasonably could have believed [one factual predicate for an offense], while other jurors reasonably could have believed [another factual predicate].").

That is, our inquiry focuses on the *jury's* perception of the evidence presented at trial. It does not focus on the *defendant's* choice of actions at the time of the alleged crime. In this context, it is worth pointing out that the last two factors articulated in *Gray*—the "fork-in-the-road" or "fresh impulse" tests—grew out of merger case law. 544 A.2d at 1257 (citing respectively *Owens*, 497 A.2d at 1096-97,[17] and *Blockburger v. United States*, 284 U.S. 299, 303 (1932)). The Fifth Amendment concern raised in merger situations of the kind addressed in *Owens* is whether the defendant should be punished twice for a single action. 497 A.2d at

---

[17] *Owens* dealt with both unanimity and merger questions, but the portion cited in *Gray* relates only to the discussion of merger. *See* 497 A.2d at 1095-97.

1095. We, therefore, look to the culpability of the defendant and whether the defendant reached a "fork in the road" after which he could have abandoned his criminal enterprise, but nevertheless "decided, as a result of a new 'impulse' to invade a different interest." *Id.* at 1095-96. Thus, we look at the crime from the defendant's perspective in resolving merger questions.

Although unanimity and merger analyses should not be conflated, *see Sanchez-Rengifo v. United States*, 815 A.2d 351, 358 (D.C. 2002), a similar type of logical analysis as employed in the "fork-in-the-road" test may nevertheless be relevant in evaluating, from the jury's perspective, whether it was reasonable for the jury to have concluded that the defendant was involved in one continuous incident or distinct incidents. For example, such an inquiry will be useful to discern whether a jury would reasonably conclude that a defendant's actions after coming to a fork in the road is a factually distinct incident, and thereby determine whether some jurors could have returned a guilty verdict based upon actions taken before the fork and some based upon actions after the fork. It is important, however, to bear in mind that unanimity and merger inquiries must be approached from different perspectives in light of the different constitutional principles they are meant to safeguard.

Whether the failure to give a special unanimity instruction is erroneous turns on whether we can conclude, upon considering the context of the entire trial,[18] that the jury was in "substantial agreement as to just what a defendant did" as the factual predicate for the verdict. *Scarborough*, 522 A.2d at 873; *Owens*, 497 A.2d at 1092-93. In other words, we look at all the circumstances of the trial to determine whether the jury could have perceived that the defendant engaged in more than one criminal act, and thus some jurors could have returned a conviction premised solely on one factual predicate and others solely on a different factual predicate.

Appellants argue that a special unanimity instruction was required in their trial because the jury could have reached non-unanimous verdicts on the charges of attempted armed burglary and ADW. This is so, they contend, because, although each appellant was indicted for a single charge of attempted armed burglary and a single charge of ADW, the evidence at trial revealed two different incidents, separated in time, each of which could be the factual predicate for the attempted armed burglary and ADW charges. The government argues that a unanimity

---

[18] "[A] judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge." *Owens*, 497 A.2d at 1093 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

instruction was not required because Bryant and Hagood were engaged in a single continuous criminal act. While it is true that both incidents occurred at the same apartment, involved the same parties, and took place within a relatively short time—approximately ten minutes—of each other,[19] these facts alone are not determinative. *See Scarborough*, 552 A.2d at 873. It is significant that in this case, when the trial is viewed as a whole, the jury was presented with evidence of what the government referred to in closing as "two burglaries" and "two shootings," and that appellants played different roles in each incident.

The government's argument has a basis in the evidence presented. The sole asserted trigger for the offenses was the hostile exchange between Hagood and Edmonds outside the apartment building. The evidence supported that appellants had a specific purpose to confront Edmonds. But a single purpose and a single criminal action are not necessarily the same thing, and this is particularly so when more than one perpetrator is involved.[20] Here, the government witnesses testified

---

[19] While the occupants' testimony varied as to the time between the first incident and the second, the testimony of Sergeant Parson established that the first call to 911 came in at 9:39 p.m. and the second call came approximately ten minutes later. The second incident occurred while the occupants were on the phone that second time, roughly at 9:49 p.m. This was also the time frame argued to the jury by the government in closing.

[20] The case before us is distinguishable from our recent decision in *Guevara* in two important aspects. First, while evidence was presented in *Guevara* that

(continued . . .)

that although both appellants followed Edmonds as he backed into the apartment, it was only Hagood who attempted to force his way into the apartment with the revolver, but was kept out. Then, after appellants had been outside for about ten minutes requesting to speak to Edmonds, they returned to the apartment, at which point they encountered and opened an unlocked door. Hagood—unarmed this time—walked into the apartment and toward Edmonds, while Bryant—this time holding the revolver—remained at the door. During the first incident, Hagood fired a shot through the door; during the second incident, Bryant fired a shot at the ceiling of the hall outside the apartment.

From this evidence of two confrontations and the government's characterization during closing arguments of appellants' actions as "two burglaries" and "two shootings," the jury could reasonably have perceived two

---

(. . . continued)

three different individuals threatened the victim at different points, the government focused on a single threat in its closing argument. 77 A.3d at 422 n.19. Second, the victim was continuously in the presence of his kidnappers throughout the entire ordeal—there was no break in the kidnapping which the factfinder could reasonably perceive to sever the events into distinct criminal acts—and thus we characterized the incident as "a single course of criminal conduct." *Id.* at 420. Ultimately, however, the *Guevara* court concluded that "even assuming . . . that [appellant] could show the trial judge committed an obvious error [in not *sua sponte* delivering a special unanimity instruction], we would nevertheless affirm her conviction because she has not established any prejudice to her substantial rights." *Id.* at 423.

factually distinct burglaries and assaults. Some jurors could have found appellants guilty based on the first incident and some jurors could have found them guilty based on the second. For example, some jurors could have found that even if Bryant did not attempt to enter the apartment during the first incident, he aided and abetted Hagood by giving him the firearm, whereas other jurors could have found Bryant guilty based on the second incident because he was holding the firearm while standing at the door to the apartment, and then fired into the ceiling.[21] The same is true for Hagood. Some jurors could have found Hagood guilty based on his forceful attempt to enter the apartment with a gun, but it was also possible that he could have been found guilty based on confronting Edmonds inside the apartment while Bryant stood guard at the door.

In determining whether a special unanimity instruction was required, we need only determine that it was possible, based on the evidence, for the jury to reasonably perceive separate incidents and then base their convictions on different

---

[21] That the jury could have convicted Bryant (or Hagood) on alternative theories of liability as either a principal or as an aider and abettor would not warrant a special unanimity instruction if there had been only a single incident. *See Hargrove*, 55 A.3d at 857 (special unanimity instruction not required when finding of guilt could be based on "alternate theories of criminal liability for a single incident"). Our decision here is focused upon the possibility that two distinct factual predicates could form the basis for conviction under either theory of liability.

factual predicates. *See Wynn*, 48 A.3d at 192 (concluding that the jury "could" have determined guilt based on different factual scenarios); *Scarborough*, 522 A.2d at 873 (noting that a special unanimity instruction is required "whenever there is evidence tending to show" separate incidents). We find that is so on this record. Accordingly, the failure to provide a special unanimity instruction *sua sponte* was clear error. *See Wynn*, 48 A.3d at 193.[22]

---

[22] Our cases that have found no clear error in failing to include a special unanimity instruction have all concluded that the evidence and context of the trial clearly showed the jury's verdict was based on either a singular factual predicate or a continuous course of conduct with no significant breaks. *See Guevara*, 77 A.3d at 422 (concluding that a special unanimity instruction was not required because "there is no objective reason to believe the jury actually disagreed as to what threatening behavior served as the basis for [appellant's] conviction" since the facts showed that all three incidents of threatening "occurred in the course of carrying out a single criminal scheme—the abduction" of the victim); *Hargrove*, 55 A.3d at 857-58 (determining there was no clear error where it is "anything but obvious . . . that the jury was in disagreement over which of these acts had taken place" and where "[i]t is likewise not obvious that [the single perpetrator's] actions"—shooting the victim twice in a vehicle and then chasing after him firing more shots—"all following quickly upon one another, met the factual predicate for a special unanimity instruction."); *McKinnon v. United States*, 644 A.2d 438, 441 n.6 (D.C. 1994) ("In closing argument, the government clearly articulated its theory of the case by addressing the burglary charge only with reference to the second entry. Under these circumstances, appellant can make no showing of plain error."); *Simms*, 634 A.2d at 446 (finding "no indication of jury confusion" requiring a special unanimity instruction because only one incident was encompassed in the indictment and the prosecutor focused on only that single incident in his closing argument); *Gray*, 544 A.2d at 1258-59 (concluding that the single perpetrator's actions—three acts of rape with "short spatial and temporal separation"—showed "a continuous course of conduct" with "no significant break between events"); *Owens*, 497 A.2d at 1094 ("The arguments of the prosecutor and

(continued . . .)

Even if the error is clear, to warrant reversal of their convictions on plain error review appellants must also demonstrate that the error affected their substantial rights and, further, that it "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 193-94 (alteration in original); *accord Olano*, 507 U.S. at 732. If the context of the trial as a whole leads us to conclude that the jury is likely to have reached a verdict based on the same predicate facts, we cannot say that appellants' substantial rights were violated. *See Wynn*, 48 A.3d at 193 (noting, on plain error review, that "the most natural conclusion" was that the jury agreed on one instance of criminal conduct); *cf. Scarborough*, 552 A.2d at 874-75 (concluding beyond a reasonable doubt, under constitutional harmless error standard, that "no reasonable juror" could have accepted one part of defendant's version of events while rejecting another). In that

---

(. . . continued)

defense counsel, taken together with the verdict form and the jury instructions, made clear to the jury that the shooting related only to the charge of assault with intent to kill while armed . . . . There was no rational way to conclude that the jury may have based its verdict on count one . . . on the shooting, which occurred after the first assault had ended."). The government's primary reliance on *Shivers v. United States* is misplaced because the *Shivers* court reasoned that the jury's verdict on the weapons offense reflected unanimous agreement "as to at least one" of the possible factual bases for assault. 533 A.2d 258, 262 (D.C. 1987). There is no similar assurance in this case. Finally, the ultimate holding in *Shivers* was that any error, if there was error, was not accompanied by "any aggravating element that would cause us to find a 'miscarriage of justice' occurred below." *Id* at 263.

examination, we do not indulge in theorizing about what the jury could have concluded that is so speculative or tortured that "no reasonable juror could have reasoned that way based on the evidence introduced at trial." *Scarborough*, 552 A.2d at 874 ("[W]e are not permitted to find reversible error when the only basis for perceiving the jury's verdict was not unanimous would be that the jury acted irrationally."). Rather, we endeavor to determine whether the entire context of the trial—the evidence introduced, the arguments of counsel, the instructions provided, and the actions of the jury—created a genuine danger that jurors, though reaching a unanimous verdict of guilt, came to their conclusion based on different factual scenarios. *See Shivers v. United States*, 533 A.2d 258, 263 n.13 (D.C. 1987) (noting that "federal courts consider a general unanimity instruction sufficient to insure a unanimous verdict 'except in cases where the complexity of the evidence or other factors create a *genuine danger* of jury confusion'" (quoting *United States v. Schiff*, 801 F.2d 108, 114-15 (2d Cir. 1986)); *Owens*, 497 A.2d at 1094 (finding harmless the failure to give a special unanimity instruction when there was "no rational way" for jurors to have come to a verdict predicated on different sets of fact).

Turning to appellants' trial, the jury was given a general unanimity instruction. They understood the necessity of reaching a unanimous verdict, as

evidenced by their question whether an acquittal must also be unanimous. Where the jury has been so instructed, the danger of a non-unanimous verdict is reduced; we can rely on the "robust intuition and good common-sense of jurors . . . to apply the standard unanimity charge to circumstances where special unanimity problems lurk." *Shivers*, 553 A.2d at 263 n.14; *see also Youssef*, 27 A.3d at 1209 (reasoning that a general unanimity instruction can contribute to reducing the risk of a non-unanimous verdict). But realistically, we recognize the limits of reliance on general instructions and common sense in cases where "the complexity of the evidence or other factors create a genuine danger of jury confusion." *Shivers*, 553 A.2d at 263 n.13 (emphasis omitted). In general, there is little, if any, downside to giving a special unanimity instruction, and where the evidence, arguments, or other factors at trial provide any basis for instructing the jury of the requirement that it must be unanimous concerning the factual predicate for its verdict, the trial court would be well advised to give such an instruction.

Second, and significantly, in this case we are able to discern the factual bases for the jury's verdicts from the verdicts themselves, without engaging in speculation about the jury's thought process. *Cf. Scarborough*, 552 A.2d at 874 (discerning from the record the most likely and rational, and least speculative, basis for the jury's verdict). The jury convicted Hagood of destruction of property

while acquitting Bryant of the same charge. During deliberations, the jury sent a note asking if a guilty verdict could be predicated on damage to the door only, or whether they could also consider the damage to the ceiling. The judge informed the jury that only damage to the door was specified in the indictment and so they could not consider damage to the ceiling for the destruction of property charge. From the jury's verdict, we know that the jury found that Hagood shot through the door during the first incident. It naturally follows that because the jury found Hagood fired the gun on that first occasion, a properly instructed jury would also have had to find Hagood culpable of ADW—it was uncontroverted that the bullet went through the door and grazed Edmonds's ankle—as well as the weapons offenses associated with the discharge of the firearm at that moment.

The natural conclusion from Bryant's acquittal on the destruction of property charge is that the jury was not convinced beyond a reasonable doubt that Bryant was culpable for the discharge of the revolver during the first incident. Such doubt would have been reasonable as there was no evidence that Bryant had the gun or was at the door at that time. However, the jury's note clearly indicates that at least some jurors were considering Bryant's conduct in firing into the ceiling during the second incident and, but for the judge's instruction, were contemplating convicting him of destruction of property based upon that action.

The reasonable inference is that the jury found Bryant culpable for his actions while he was armed during the second incident, and that these actions were the more likely basis for the verdict finding Bryant guilty of ADW.[23] Even though the evidence sufficed to convict both appellants of ADW on either of the incidents, we think it much more natural to conclude that the jury would find guilt based on the incident in which each appellant acted as a principal in using the gun and not as an aider and abettor of the other's use of the gun.[24]

---

[23] While explaining the ADW charge, the trial court instructed the jury, *inter alia*, that in order to convict either Bryant or Hagood the jury must find beyond a reasonable doubt that the target of the assault was Edmonds, and that the appellants either "injured or attempted to injure" him or "committed a threatening act that reasonably would have put" Edmonds in fear of immediate injury. The government's evidence demonstrated that appellants' intention throughout the entirety of the events was to either injure or threaten Edmonds. By standing in the doorway armed—as one witness said, "waving" the gun around and then shooting it at the ceiling as soon as he was forced out—Bryant was acting in a manner threatening to Edmonds (as well as to others present who were trying to protect him) while Hagood entered the room to again confront Edmonds. This is the most likely factual basis for the jury's verdict finding Bryant guilty of ADW given the jury instruction focusing on Edmonds as the target of the attack and Bryant's active participation at the scene during the second incident, whereas no testimony placed him at the door during the first incident.

[24] Bryant makes the argument that the evidence was insufficient to convict him for aiding and abetting Hagood's armed assault or attempted burglary. Even assuming *arguendo* that the jury convicted him not as a principal, but under an aiding and abetting theory, the evidence adduced at trial, viewed in the light most favorable to the jury's verdict and drawing all inferences the jury could reasonably draw, is legally sufficient to support Bryant's conviction. *See McCraney v. United States*, 983 A.2d 1041, 1056 (D.C. 2009). Bryant argues that even if he did give the gun to Hagood when they first encountered Edmonds, there was no evidence

(continued . . .)

A similar logic applies to the likely factual bases for the guilty verdicts for attempted burglary while armed. The jury was given explicit instructions on the order in which they should consider the burglary charges. They were to consider initially "first degree burglary while armed," then "attempted first degree burglary while armed," then "first degree burglary unarmed," then "attempted first degree burglary unarmed," and finally "unlawful entry." The jury was told to consider these offenses in the order prescribed and to not go on to the other charges once they had reached an agreement on a charge. From the jury verdicts finding both appellants guilty of *attempted* burglary *while armed* we can conclude the jury found that each appellant was armed, but did not complete the burglary.

As we have discussed above, the natural conclusion for the jury based upon the evidence presented was to find Hagood culpable of ADW based on the first incident, and Bryant culpable of ADW based on the second incident. Consistent

---

(. . . continued)

that Bryant knew Hagood would use it while attempting to break into the apartment. Even so, Bryant's continued participation after Hagood shot the gun by returning, armed, to the apartment a second time permits a reasonable inference that Bryant intended to assist Hagood in his actions on both occasions. In any event, as we discuss, the jury's most likely basis for finding Bryant guilty was not on an aiding and abetting theory, but as a principal during the second incident. Bryant does not contest the sufficiency of the evidence supporting his conviction as a principal.

with these findings, it would have been reasonable and natural for the jury to also find that on each of those occasions the armed appellant attempted, but did not successfully complete, the crime of burglary. In the first incident, Hagood succeeded only in getting his head, arm, and gun inside the door before he was pushed out.[25] If the jury found Hagood had possession of the gun and had attempted—but failed—to gain entry into the apartment at that moment, the jury would naturally and reasonably use those facts as the predicate for finding Hagood guilty of attempted burglary while armed.

In the second incident, the testimony raised doubts as to whether Bryant actually entered the apartment, but not about whether he was armed. Lawana Mays testified that Bryant never completely made it into the apartment. She said Bryant was coming towards the interior of the apartment from the hallway with a gun that he later shot into the hallway ceiling outside the apartment, but that he was pushed out before he could enter the apartment. Edmonds, on the other hand, testified that Bryant was just inside the apartment, with his back against the door. The inconsistent accounts could well have left the jury uncertain (or at odds) as to whether Bryant entered the apartment. It was thus natural and reasonable that the

---

[25] No witness testified that Bryant was also trying to get into the apartment or was seen at the door during the first incident.

jury found Bryant was armed in the second instance and had attempted—but failed—to enter the apartment.[26]

Based on the jury note inquiring about the factual basis for the destruction of property charge, the acquittal of Bryant for destruction of property premised on the shot through the door, and the evidence presented to the jury with respect to each appellants' actions in the first and second incidents, the most logical and natural factual predicate for the jury's guilty verdicts on the ADW and burglary charges for Hagood was the first incident, and, for Bryant, the second incident. Under the circumstances, the danger that the jury verdicts might have been based on different, non-unanimous factual predicates is lessened. *See Wynn*, 48 A.3d at 193 (noting it was "doubtful" that substantial rights were affected).[27]

---

[26] The witnesses testified that Hagood, on the other hand, completely entered the apartment, but he was unarmed. This supports the inference that the jury actually found Hagood guilty based on the first incident because they were instructed to consider attempted *armed* burglary before completed *unarmed* burglary.

[27] In *Wynn*, the jury was presented with evidence that MPD officers, responding to the sound of gunfire, found a victim lying mortally shot in the street. 48 A.3d at 183. The police recovered a 9-mm Glock pistol from the scene. *Id.* at 183-84. The jury heard testimony that a second gun was hidden in a home nearby and never recovered. *Id.* at 184. Finally, the jury heard that police recovered a third weapon, a .45 caliber handgun, from the inside of appellant's girlfriend's car, parked near the scene of the shooting. *Id.* at 184. We concluded that failure to *sua sponte* deliver a special unanimity instruction on appellant's CPWL charge was

(continued . . .)

Even if appellants' substantial rights were affected, we would not exercise our discretion to reverse in this case because they cannot show that the "lack of a special unanimity instruction seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 194 (alteration in original). Where the jury was presented "ample" evidence to support all of the possible bases for a verdict, an appellant cannot carry his burden on this prong of plain error analysis. *See id.*; *Yousseff*, 27 A.3d at 1208-09 ("Appellant cannot meet this standard given the exhaustive evidence presented at trial supporting each incident . . . ."). In this case, the jury obviously rejected the defense's theory that the government's entire case should be disbelieved because it rested on the complainants' fabricated testimony. Even though their accounts were not entirely consistent, the same witnesses testified as to both incidents. Having chosen to credit the government witnesses, the jury had more than sufficient evidence to find Hagood and Bryant guilty for their actions during both the first and second incidents. While the right to a unanimous jury verdict is fundamental, we are satisfied that the error here was

_____

(. . . continued)
obvious error. *Id.* at 193. However, we were "doubtful" appellant's substantial rights were affected. *Id.* "Although there was evidence regarding three instances of carrying a pistol, the most natural conclusion [was] that the jury convicted Mr. Wynn for carrying the .45 caliber handgun" because appellant admitted to owning the weapon and the parties focused on that specific weapon in closing argument. *Id.*

not so "particularly egregious" as to require reversal, *Wheeler*, 930 A.2d at 248, and that the particular circumstances of this case do not pose the type of "exceptional circumstances where a miscarriage of justice will result if we do not reverse." *Wynn*, 48 A.3d at 194.[28]

### III.

With this understanding of the most likely factual underpinnings of the verdicts, we now address appellants' other joint contention on appeal, namely, that their PFCV convictions should merge. Bryant and Hagood were each convicted of two counts of PFCV, one predicated on the attempted burglary charge and one predicated on the ADW charge. Appellants' arguments boil down to the assertion that their two respective PFCV convictions are predicated on the same single possession of a single weapon during a single crime of violence and must therefore

---

[28] Bryant makes a related argument that he is entitled to relief because his counsel's failure to request a special unanimity instruction prejudiced him and therefore constituted constitutionally ineffective assistance of counsel. If we were to address this claim on direct appeal, our review would be limited to the record on appeal. We decline to do so in this case as appellant has notified the court that he has filed a motion to vacate the judgment pursuant to D.C. Code § 23-110 (2012 Repl.) based on this very asserted deficiency of counsel. That action is pending before the trial court and will be subject to appeal to this court upon a more fully developed record of the pertinent issues. "This court is in the best position to assess a claim of ineffective assistance of counsel where a separate motion has been filed and an appropriate record has been made." *Mack v. United States*, 570 A.2d 777, 785 (D.C. 1990).

merge. We review claims of merger *de novo*. *See Hampleton v. United States*, 10 A.3d 137, 146 (D.C. 2010).

The general rule is that when the predicate offenses do not merge, separate PFCV convictions founded upon those offenses do not merge either. *See Matthews v. United States*, 892 A.2d 1100, 1106 (D.C. 2006) (citing *Stevenson v. United States*, 760 A.2d 1034, 1035 (D.C. 2000)). The predicate offenses here, attempted burglary while armed and ADW, do not merge. *See Hanna v. United States*, 666 A.2d 845, 856 (D.C. 1995). However, we have fashioned a limited exception to this rule where multiple PFCV convictions "arise out of a defendant's uninterrupted possession of a single weapon during a single act of violence." *Matthews*, 892 A.2d at 1106 (citing *Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999)). As with other Fifth Amendment double jeopardy claims, to determine whether the defendant's conduct was a single act or distinct acts we employ the "fresh impulse" or "fork-in-the-road" test. *Stevenson*, 760 A.2d at 1037. "If at the scene of the crime the defendant can be said to have realized that he has come to a fork in the road, and nevertheless decides to invade a different interest, then his successive intentions make him subject to cumulative punishment. . . ." *Id.* (quoting *Spain v. United States*, 665 A.2d 658, 660 (D.C. 1995)).

The government urges us to apply this rule only where the criminal offenses were "wholly or nearly simultaneous." However, *Nixon* and its progeny do not lend themselves to such a restricted reading of the exception. Discussing *Nixon* in *Matthews*, we noted that predicate offenses need "not necessarily [be] completed at exactly the same time." 892 A.2d at 1107. Instead, we must look at whether the criminal transaction was a "continuous whole" such that the predicate crimes "overlapped substantially and were not independent of each other." *Id.* In other words, to determine that two PFCV convictions merge it may be sufficient that the predicate offenses happened simultaneously, but simultaneity is not necessary so long as the predicate offenses were common to a single violent act and overlapped substantially. The exact time-frame is less important than whether the defendant had an opportunity during that time to reflect on whether to abandon his criminal enterprise, but nevertheless chose to invade a new and distinct interest while armed with the same weapon.

Applying these principles to the facts of this case, we conclude that each appellant's two PFCV convictions merge. As we have discussed, Hagood's two PFCV convictions were most likely premised on the burglary and ADW which occurred during the first incident. Thus, Hagood's PFCV conviction for attempted burglary is associated with his attempt to enter the apartment, which was resisted

by the occupants who forced him out.  This was immediately followed, seconds later, by Hagood firing the handgun through the door—the predicate offense (ADW) for his other PFCV conviction.  These events unfolded in rapid succession as Hagood was following Edmonds with the gun.  During this time Hagood would not have had the time to pause to reassess his situation before firing the gun in reaction to having the door closed on him.  Our cases indicate that something more than a momentary interruption is required to sever the singular continuous possession of a weapon into distinct, separately punishable criminal actions. *Compare, e.g.*, *Stevenson*, 760 A.2d at 1037-38 (holding PFCV convictions predicated on armed robbery and burglary charges did not merge where two armed men entered a store, spoke to the clerks, and browsed the merchandise, providing "time to reflect" whether to continue to rob the store), *with Matthews*, 892 A.2d at 1107 (holding PFCV convictions based on armed carjacking and armed robbery merged where, in the course of an armed carjacking the defendant decided to keep the purse of the victim, because both predicate offenses "began at the same time and were committed together by means of the same act of violence involving the same weapon").

Likewise, Bryant's two PFCV convictions, predicated on ADW and attempted burglary during the second incident, merge.  As we have discussed, the

most likely factual basis is that Bryant stood at the threshold of the apartment with the gun in his hand while Hagood entered to confront Edmonds, but Bryant was quickly pushed out of the apartment, prompting the shot into the hallway ceiling outside. There was no appreciable point at which Bryant could have reconsidered his actions and yet chosen to inflict a new, distinct harm—it was all part of providing armed support for Hagood.

Having concluded that appellants' PFCV convictions merge, we remand the case for the trial court to vacate one PFCV conviction for each appellant and to allow the trial court, in its discretion, to resentence appellants accordingly. *See Kitt v. United States*, 904 A.2d 348, 358 (D.C. 2006).[29]

---

[29] Bryant was sentenced for attempted armed burglary to 90 months' incarceration and 5 years of supervised release; for the associated PFCV to 90 months' incarceration and 3 years of supervised release. He was sentenced for ADW to 60 months' incarceration and 3 years of supervised release; for the associated PFCV to 60 months' incarceration and 3 years of supervised release. The sentences for attempted armed burglary and its PFCV run concurrently to each other and consecutively to the ADW and its PFCV, which run concurrently to each other. Sentences for Bryant's convictions for carrying a pistol without a license and unlawful possession of a firearm run concurrently to all other counts. Merger of either of Bryant's PFCV convictions would make no difference to his total time of incarceration and supervised released because the predicate offenses carry the same sentence as each associated PFCV.

Hagood's situation is different. Hagood was sentenced for attempted armed burglary to 100 months' incarceration and 5 years of supervised release; for the associated PFCV to 100 months' incarceration and 5 years of supervised release.

(continued . . .)

**IV.**

We now turn to the balance of Bryant's arguments on appeal.

**A.      Judge's Questioning of Witnesses**

Bryant contends that the trial judge impermissibly asked questions of the witnesses.  As appellant raised no objection before the trial court, we review this claim for plain error.  *See Jennings v. United States*, 989 A.2d 1106, 1114-15 (D.C. 2010).

Bryant complains of three instances in which the judge asked government witnesses to clarify whether they were testifying that Bryant had come inside the

---

(. . . continued)
He was sentenced for ADW to 72 months' incarceration and 3 years of supervised release; for the associated PFCV to 100 months' incarceration and 3 years of supervised release.  The sentences for attempted armed burglary and its associated PFCV are concurrent, but run consecutive to all other counts—ADW, PFCV, destruction of property, unlawful possession of a firearm, and carrying a pistol without a license—which run concurrently to each other.  Because Hagood's ADW sentence is less than the sentence he received for the associated PFCV, should that PFCV be vacated, Hagood's total time of incarceration would be less than what the trial court originally ordered.  The court may choose to vacate the PFCV associated with Hagood's attempted armed burglary as that would preserve the total time of incarceration and supervised release originally ordered.  "That, however, is a matter for the trial court to decide in the exercise of its sentencing discretion." *Kitt*, 904 A.2d at 358.

apartment, an element of burglary.  First, on direct examination, Bostic testified that Bryant was "on the ledge" of the door to the apartment.  The prosecutor asked her to place a marker on an exhibit to indicate where Bryant was standing.  After Bostic placed the maker on the photograph, the judge asked Bostic if Bryant "was inside the apartment or outside the apartment."  Bostic replied, "He was kind of just like standing right there, he wasn't all the way inside, he was just standing like on the ledge.  Kind of like halfway in, but he wasn't all the way in."  Second, after Edmonds testified that Bryant "was holding the door like this" the judge asked Edmonds, "Holding the door like what?"  Edmonds stated, "Like this, with his back against the door."  The judge clarified, "So, he was inside the apartment with his back against the door?"  Edmonds answered affirmatively.  Third, in attempting to demonstrate in court where Bryant was in relation to the threshold of the apartment, the prosecutor asked Lawana Mays to tell him when he was in the same relationship to a line on the courtroom floor as Bryant was to the apartment's threshold.  In attempting to make a record, the following exchange occurred:

| The Court: | The record should reflect that the prosecutor's standing outside the line. |
| The Prosecutor: | Outside the line? |
| The Witness: | About like this. |
| The Court: | Okay.  He's got his toe on the line. |

The Prosecutor:     All right.

The Court:          But did he come into the apartment?

The Witness:        He didn't actually make it completely in but he was close enough where we had to push him out.

A judge is permitted to ask questions of witnesses so long as she does not assume a partisan role. *See Jennings*, 989 A.2d at 1115. The judge may "permissibly illuminate the witness's testimony" so long as the questions asked "in no way jeopardized the appellant's presumption of innocence . . . or improperly suggested to the prosecutor tactics he had not considered." *Johnson v. United States*, 613 A.2d 888, 895-96 (D.C. 1992) (citations omitted). In each instance of which Bryant complains, the trial judge was clarifying for the record demonstrations or actions performed in court pursuant to inquiries the prosecutor had initiated. The judge did not exceed the proper bounds of the judicial role. In any event, Bryant cannot demonstrate prejudice because he was convicted of attempted armed burglary instead of the completed crime. The clarification of the witnesses' testimony on whether or not he fully entered the apartment was either to his advantage or did not prejudice him.

## B. Self-Defense Instruction

Bryant contends that the trial judge erred by not *sua sponte* instructing the jury on self-defense. His claim of self-defense is premised on the fact that Bryant fired the gun at the ceiling only after Marshall and Mays "attacked" him, showing that he "did nothing to precipitate the attack, and that the government witnesses were the first aggressors."[30]

A defendant is "entitled to a self-defense instruction if the evidence, either that of the defense or prosecution, fairly raises the issue." *Hernandez v. United States*, 853 A.2d 202, 205 (D.C. 2004) (quoting *Guillard v. United States*, 596 A.2d 60, 63 (D.C. 1991)). Conversely, a defendant is not entitled to a self-defense instruction if he "deliberately places himself in a position where he has reason to believe his presence would . . . provoke trouble." *Howard v. United States*, 656 A.2d 1106, 1111 (D.C. 1995) (internal quotation marks and alterations omitted) (quoting *Mitchell v. United States*, 399 A.2d 866, 869 (D.C. 1979)). Bryant's return to the apartment with a gun in his hand on the second occasion, after it was clear the occupants would object, precipitated the physical confrontation. As such,

---

[30] Bryant's argument assumes that the jury found him guilty only of shooting at the ceiling, but we note that the evidence sufficed to find him guilty of ADW and attempted burglary before he fired the gun.

he was not entitled to a self-defense instruction.[31]  *See id.* ("[T]he degree of initiative appellants had taken in creating the confrontation precluded a claim of self-defense.").

## C.    Carrying a Pistol Without a License

Bryant asserts that his convictions for unlawful possession of a firearm and CPWL merge.  We have recently addressed a similar contention and held that these are "separate and distinct" offenses.  *Snell v. United States*, 68 A.3d 689, 694 (D.C. 2013).  As such, a defendant may be convicted and sentenced for both offenses and the sentences may run consecutively.  *Id.*  Bryant also claims that because the District of Columbia no longer licenses firearms, the prohibition against carrying a pistol without a license is constitutionally infirm.  We addressed this question head-on in *Snell* and concluded the statute was valid and enforceable, *id.* at 691-93,

---

[31]  Bryant makes a related argument that he did not have effective assistance of counsel because his lawyer did not request a self-defense instruction.  "Since the evidence at trial did not support giving this instruction, counsel's failure to ask for it did not represent deficient performance" and we therefore find no merit to Bryant's contention that his counsel was constitutionally deficient.  *Washington v. United States*, 689 A.2d 568, 573 (D.C. 1997).

a decision we are not at liberty to revisit here. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).[32]

\* \* \*

For the foregoing reasons, we remand for the trial court to merge appellants' PFCV convictions and to resentence appellants as the court, in its discretion, may find appropriate. In all other respects, the convictions are affirmed.

*So ordered.*

---

[32] Because we conclude that there was no trial court error or prejudice resulting from error, we reject Bryant's claim that the collective impact of trial court error requires reversal.