*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 11-CF-106, 11-CF-162, 11-CF-281, & 11-CF-745

JOSEPH JENKINS,
EDWARD E. WARREN,
DARNELL N. ANDERSON,
&
JAMES BATES,

APPELLANTS,

v.

UNITED STATES,

APPELLEE.

Appeals from the Superior Court of the
District of Columbia
(CF1-30319-08, CF1-20614-09, CF1-20672-09, & CF1-29847-08)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued February 12, 2015                Decided April 23, 2015)

*Thomas T. Heslep* for appellant Jenkins.

*Gregory S. Smith* for appellant Warren.

*Jason M. Knott*, with whom *William W. Taylor III* was on the brief, for appellant Anderson.

*Thomas C. Paynter* for appellant Bates.

*John P. Gidez*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth*

*Trosman*, *Elizabeth H. Danello*, and *David P. Saybolt*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, and PRYOR and FARRELL, *Senior Judges*.

FARRELL, *Senior Judge*:  Appellants collectively were indicted for a series of violent crimes and related other offenses arising from what the government alleged was a conspiracy to retaliate against a rival "crew" or street gang primarily for the shooting death of William "Boo" Foster, a leader of the so-called Todd Place Crew (or "TPC") of which appellants were members.

The jury acquitted appellants of the conspiracy and declined as well to convict them based on related vicarious liability principles.  Instead it convicted them of substantive crimes as follows:  Jenkins, Bates, and Anderson were found guilty of the April 15, 2008, premeditated murder of Gary English and assault with a dangerous weapon on bystander John Green; Jenkins and Anderson, but not Bates, were convicted of related firearms offenses.  Jenkins and Warren were found guilty of carrying a pistol without a license on May 10, 2008, and Jenkins of possession of a firearm by a convicted felon (PFCV), but both were acquitted of the associated shooting of Antonio Ingram on that date.  Bates was further convicted of armed assault with intent to kill and armed aggravated assault on Chaquon Wingard and Ricardo Russell on May 26, 2008, and of related gun

charges. And all four appellants were found guilty of committing each of the above crimes as part of their membership or active participation in a "criminal street gang." D.C. Code § 22-951 (a)(1) (2014 cum. supp.).[1]

Although appellants assign multiple errors as a basis for reversal of their convictions, none persuades us except that some of the convictions merged and must be vacated on remand.

## I.      The Facts

The victims of all of the alleged shootings, except for John Green, were shown to be members of the rival T Street Crew ("or TSC"), which the Todd Place Crew held responsible for the killing of William Foster. The two crews, while engaged in drug trafficking in their respective neighborhoods, had begun "beefing" by 2008, with frequent altercations and assaults that came to a head on April 14,

---

[1] Jenkins was found not guilty of the street gang charge corresponding to his PFCV conviction for the assault on Green. Jenkins and Warren were convicted of obstructing justice on April 18, 2008, for attempting to dispose of firearms, but the government now concedes – and we agree – that the evidence did not support those convictions. *See Wynn v. United States*, 48 A.3d 181, 190-91 (D.C. 2012). Accordingly, they must be vacated on remand along with the corresponding street gang conviction.

2008, when Foster was shot to death by someone the TPC believed was associated with the T Street Crew. According to Robert Davenport, a TPC insider who testified for the government, there was an immediate "mutual understanding within the [TPC]" that a TSC member would be killed in retaliation.

The day after the shooting, Davenport testified, TPC members gathered at the house of crew member Ernest Benjamin. Having learned the location of a TSC member, they left the house in two cars, with Bates driving and Anderson and Jenkins occupying the first vehicle, a white Chevrolet HHR or PT Cruiser. (All three defendants had been seen in that car earlier the same day.) An eyewitness who knew Bates, Raymond Devese, saw him at the wheel of the car as it pulled up to where TSC member Gary English had just parked his car. Multiple gunshots from two handguns, a .45 caliber Sturm Ruger semi-automatic and a Hi-Point .45 caliber, were fired from the white car, striking English repeatedly and killing him, and grazing Green, a bystander.

According to Davenport, he and the three other occupants (including appellant Warren) of the second car, a blue Mercury Grand Marquis, arrived after the white car had fled the shooting scene. When they returned to Benjamin's

house Bates, Anderson, and Jenkins were there and Anderson gestured with a Ruger .45 caliber pistol as if to say "we just got finished shooting at somebody."[2] Bates appeared nervous and concerned that eyewitness Devese had seen his face. Davenport and the others "didn't feel as though it was settled" with the English shooting, and Davenport believed a "lot more had to take place."

Further evidence linking Jenkins and Anderson to the English homicide and Green assault came from two related sources. In the week or so after the homicide, police recovered the two handguns used in the shootings from the ground inside the fence line of Mount Olivet Cemetery in the District. This occurred after Davenport, Anderson, Warren, and co-defendant Obie English, riding in the Grand Marquis and armed with pistols,[3] found themselves pursued by police near the cemetery. Davenport and Anderson bailed out of the car, and as they ran a police officer chasing them saw each man reach toward his waist and toss an object. In a later recorded telephone call from jail after his arrest, Anderson expressed concern

---

[2] The Ruger, according to Davenport, was a distinctive gun with a customized clip and a black grip that he had seen in Anderson's possession before.

[3] Davenport testified that he had a .45 caliber Hi-Point, Anderson had a .45-caliber Sturm Ruger, and Warren had a 9-mm Lorcin. A girlfriend of appellant Warren testified that she had seen him firing a gun determined to be a 9-mm Lorcin behind a house on April 16.

to Jenkins about the guns, and when Jenkins stated that he had "tried to go back" to find the guns, Anderson replied that the police had "scooped them." A week later Anderson complained in a recorded call that Warren had not "even go[ne] back . . . [to] look for" the gun Warren had thrown into the cemetery and which the police had also recovered. Warren "was suppose[d] to go back . . . and . . . scoop that [gun]," Anderson stated, to which Jenkins replied, "[W]e did, [but] it wasn't there."

On May 10, 2008, Antonio Ingram, a member of the T Street Crew, was shot repeatedly in an altercation in which Warren was also shot. Jenkins confessed to his sister that Warren had been leaving a carry-out when "somebody started shooting," so Jenkins returned fire. Although the government saw the Ingram shooting as a second retaliation for the Foster homicide, the jury convicted both Jenkins and Warren of only weapons offenses and related street gang charges, evidently accepting their partial defense that regardless of what motivated them to bring guns to the scene, Ingram was shot in self-defense.

Finally, Bates was found guilty of shooting TSC members Ricardo Russell and Chaquon Wingard from a dark-colored car on May 26, 2008, based on

testimony by Jamila Hughes – admitted without objection – that she was present and heard the gunshots, then overheard Russell say that Bates had been the shooter.[4]

## II. Severance of Defendants

Before trial, appellant Warren gave written statements to codefendants Bates, Jenkins, and English claiming that he, not they, had been in the white car on April 15 and shot English with a Ruger .45 caliber pistol. Warren then took the stand in the defense case and "admit[ted] to shooting and killing Gary English" because, he said, English had "sold [him] a gun that didn't work." An unnamed man Warren did not know had driven Davenport and himself to the scene, where both fired shots at English. Although Warren did not say so expressly, the implication of his testimony was that none of the defendants except himself took part in the shooting.

---

[4] The jury acquitted all appellants of shooting four victims, one or more of whom was a T Street Crew member, on July 25, 2008. It likewise acquitted Warren and co-defendant Obie English of shooting Dante Vaughn on April 11, 2008, days before the killing of William Foster. English, though charged with conspiracy and multiple substantive offenses, was acquitted of all charges.

Warren's attorney, Michael Madden, along with the other defense counsel, had aggressively attacked the government's case, including the testimony of insider Davenport who, according to one attorney in closing argument, would lie and "throw his own sister under the bus" to keep from spending more time in prison. Faced with Warren's eve-of-trial turnabout, Madden was openly hostile to his client's assumption of blame in eliciting his testimony, which gave rise to successive motions for a severance and mistrial by the other defendants.[5] They argued that Madden's questioning prejudiced them in two ways, first by implying that Warren had been pressured by them to take responsibility, and that in any event Madden's understandable action as a "second prosecutor" in debunking Warren's admission had produced what amounted to incompatible defenses between the credible attack all defendants had mounted on the government's case, and what Madden himself knew was a far-fetched effort by his client to assume responsibility. The trial judge denied the motions when first made, but declared her willingness to give "any instruction that you [the defendants] want me to give, either during or after [Warren's testimony]." When Warren finished testifying, the judge again denied the motions, rejecting the argument that "the atmospherics of

---

[5] Their pretrial motions for severance on learning of Warren's intention to assume blame, in order to themselves call him as a witness in a trial separate from him, were denied.

. . . [Madden's] suggestion that [Warren] was falsely taking responsibility . . . spilled over in some way onto the other defendants."

Anderson, Bates, and Jenkins now renew their contention that, in a case where the Gary English murder was the centerpiece of the prosecution, only a mistrial and severance from Warren could undo the prejudice from his testimony visibly disbelieved by his own lawyer in questioning him and in summation. These appellants, Jenkins argues, "really confronted a conflict between [their] defense[s] and the assertions of [their] co-defendant's attorney, which amounted to unsworn testimony" that Madden knew his client believed the truth to be other than his testimony. Anderson likewise argues that the combined suggestions from Madden and the prosecutor of "pressure from the co-defendants" and Madden's knowledge, "based on his previous privileged conversations with Warren, that his client was falsely accepting responsibility," made Warren's defense "irreconcilable with Anderson's and put [Madden] in the role of a second prosecutor."

Judge Leibovitz, however, carefully weighed appellants' claims of prejudice from the joint trial each time they were raised. For the reasons that follow, she did not abuse her discretion in finding that neither the manner in which Warren's

testimony was presented nor the comments made on it in summation jeopardized appellants' right to a fair trial.

Appellants' burden to win reversal on this ground is not an easy one. Given the "vital role" played by joint trials of defendants indicted together and properly joined, *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 209 (1987)), the trial court's denial of a severance may be disturbed "only upon a clear showing that it has abused its considerable discretion." *Moore v. United States*, 927 A.2d 1040, 1056 (D.C. 2007) (citation and internal quotation marks omitted). Substantively, the trial court "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or would prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. In reviewing severance denials under this test, our decisions have considered the likelihood in the circumstances that the "risk of prejudice . . . can be cured with proper instructions," *id*. at 540-41, as well as the strength of the evidence against the individual defendants, *see Robinson v. United States*, 100 A.3d 95, 115 (D.C. 2014), and the care that the jury by its verdict has shown in assessing the proof against each defendant in a joint trial. *See Hargraves v. United*

*States*, 62 A.3d 107, 116 (D.C. 2013); *Sams v. United States*, 721 A.2d 945, 955 (D.C. 1998).

Like the trial judge, we conclude that Warren's testimony, whatever drama ("atmospherics") it injected into the trial, did not compromise either appellants' right to mount an effective defense or the jury's ability to render a reliable judgment. Warren's assumption of sole blame, of course, was not literally in conflict with Anderson's, Bates', or Jenkins' defense that they had nothing to do with the Gary English killing. And the argument that when Madden in effect cross-examined his client about his story the jury was led to infer that, from "privileged" communications beforehand, Madden knew that *Warren* knew the truth to be otherwise – Warren in effect becoming another witness against them – is highly speculative on this record. Were this a case in which the proof convicting the appellants other than Warren of the English murder were paper-thin, the danger might be realistic that a jury, looking for more, would draw inculpatory inferences from Madden's role as "second prosecutor" or Warren's dubious account by negative implication. But it was not. As recounted earlier, Bates was identified as driving the white car from which the fatal shots were fired, the same car he had been seen driving earlier that day with Anderson and Jenkins as passengers. The

murder weapons were retrieved from the cemetery after Anderson tossed something from his waist while being chased past the cemetery; and Jenkins related his efforts to return there and "scoop up" the guns to an Anderson worried that the police had found them. This evidence, corroborating Davenport's detailed account of the defendants' retaliatory motive for the shooting, greatly reduced the risk that the jury had need to look to any bolstering of the prosecution's case from Madden's hostility in presenting Warren's testimony or in commenting on it in closing. As to any residual risk, the judge had announced her readiness from the start to give any neutralizing instruction requested.

For these reasons, too, appellants' argument that Warren's testimony resulted in antagonistic defenses enough to require severance is unconvincing. The government cites our past decisions holding that irreconcilable defenses do not require severance if "the conflict in defenses alone would not sway the jury" because there is enough evidence of the movant's guilt "beyond that required for . . . a motion for judgment of acquittal." *Tillman v. United States*, 519 A.2d 166, 171 (D.C. 1986) (quoting *Ready v. United States*, 445 A.2d 982, 987 (D.C. 1982)). The recited evidence of guilt meets this standard, but even if that standard

has been superceded by the Supreme Court's *Zafiro* test,[6] the conflict between what appellants deem their credible attack on the government's case and Warren's account that Madden himself called "inherently ridiculous" to the jury did not prevent the jury from making a reliable judgment about the defendants' guilt or innocence.[7]

Appellants further argue that attorney Madden – and the prosecutor – went beyond disparaging Warren's account to imply that it stemmed from pressure or coercion the co-defendants had exerted on him. Our decisions require the trial court to guard against unfounded assertions that a witness was threatened or coerced by a defendant or persons associated with him. *See, e.g.*, *Mercer v. United States*, 724 A.2d 1176, 1184 (D.C. 1999). But the trial judge did not view Madden's questions to Warren as implying such pressure, nor do we. The government accurately characterizes the record on this point in its brief:

---

[6] In *Hargraves, supra*, we raised but had no need to answer the question of whether "[a] sufficient-independent-evidence requirement is questionable in light of *Zafiro* . . . ." 62 A.3d at 116 n.29.

[7] Nor do appellants otherwise identify a "specific trial right," *Zafiro*, 506 U.S. at 539, that they were denied by Warren's testimony as Madden presented or argued it. Their counsel all aggressively challenged the government's proof, and the judge instructed the jury to consider the evidence separately as to each defendant, something it plainly did. See discussion in text, *infra*.

> Trial counsel's questions about whether Warren knew his co-defendants; whether he had any conversations with any of them outside the courtroom; whether there were any separation orders [while they were all in jail]; whether he was "enemies" with Jenkins (answer: "no"); whether he "look[ed] up" to any of his co-defendants (answer: "no"); whether he wanted to see any of them go to jail (answer: "[t]hey don't have nothing to do with me"); and whether he believed he was "going to die in prison," and "[had] nothing to lose" by admitting to the English murder because he was already serving 40-year sentences in two other murder cases (answer: "no") [-- these questions] did not suggest directly, or by implication, that Warren was pressured by any of his co-defendants to admit to the English murder.

Appellants also point to testimony by Warren's brother that in a phone call Warren told him that "he had to [take the rap]." On hearing this testimony the judge interrupted the questioning ("I'm going to stop you there"), and Madden re-phrased his question to ask, "Is it true that's what he said, 'I'm going to take the rap?'", the brother replying "Yes." The judge then twice told the jury that the brother's statement could not be "consider[ed] . . . against any of the other defendants . . . in this case." Lastly, appellants highlight the prosecutor's statement in rebuttal argument that one reason for Warren's exculpatory testimony was "the fact of crew loyalty," but the other was "the . . . possibility [that] . . . somebody leaned on him." The judge immediately "str[uck] that last statement by counsel"

and told the jury to "disregard it" because "there's absolutely no evidence whatsoever in this record that anybody leaned on anybody."

All told, we agree with Judge Leibovitz that Warren's testimony, as it unfolded and was commented on in closing, posed no "serious risk" – certainly none that could not "be cured with proper instructions," *Zafiro*, 506 U.S. at 539, 540 – of distracting the jury from evaluation of the evidence carefully and separately as to each defendant, as it was told to do. And we have strong reason to believe this is just what the jury did. It acquitted all defendants of conspiracy and rejected vicarious liability as a basis for the substantive charges. It acquitted Warren and co-defendant Obie English of the Gary English murder, and Jenkins and Warren of the May 10 assault on Antonio Ingram. And it acquitted four of five charged defendants (Anderson, Jenkins, Warren, and English) of the May 26 shooting of TSC members, and all defendants of the July 25 shooting of victims that also included a TSC member. In short, it "carefully examined the evidence," demonstrating that it "was able to assess each defendant's culpability independently" and "could . . . fairly decide the guilt or innocence of one defendant separately from the others." *Sams*, 721 A.2d at 955; *see also Hargraves*, 62 A.3d at 116 (the jury's "differentiat[ion]" of one defendant from others by its verdict

"defeat[ed] . . . speculation" that it "inferred a defendant's guilt just from . . . conflicting defenses").[8]

---

[8] Jenkins and Bates argue separately that pretrial severance would have allowed them to use Warren's exculpatory testimony affirmatively by presenting it in a friendly light, not as impeached by his own lawyer. But Warren's account of the English shooting would have faced, in a separate trial, the same problem of contradicting most of the other evidence of that fatal assault; and he would have been subject to much the same credibility attack he endured in this trial, including the lengthy sentences he was serving for unrelated crimes, which (it was argued) made his assumption of blame here cost-free. The suggestion, in short, that his version would have proved more believable in a separate trial is pure surmise.

Anderson's additional argument for severance rests on an asserted disparity of evidence. He points out that substantively he was charged with only one of the five alleged shootings, and asserts that even as to that one the evidence presented was "far more damaging" against the co-defendants than against him. But, as we have shown, substantial evidence corroborated Davenport's testimony linking Anderson to the English shooting as reprisal for the Foster killing, and the jury's care in rendering verdicts – including rejecting the conspiracy charge and vicarious liability – belie the notion that testimony about the other four shootings swayed the jury to unfairly convict him of the English murder. Similar considerations require rejection of Jenkins' and Bates' argument that disparity in the proof had anything to do with their convictions.

Finally, Jenkins argues that the trial judge erred in not severing the multiple "street gang" counts from the other charges, as the defendants had requested. He does not dispute that the charges were properly joined under Super. Ct. Crim. R. 8 (a); his claim is that evidence of drug-dealing admitted to prove the existence and *raison d'etre* of the TPC would not have been admissible in a separate trial of the conspiracy and related charges. But, as the judge recognized, that evidence was also part of the background formation and rivalry of the TPC and TSC leading to William Foster's murder, hence was relevant to the conspiracy and many substantive crimes alleged in furtherance of it. Moreover, on this record of careful discrimination by the jury in rendering its actual verdicts, Jenkins is hard-pressed

(continued…)

### III.   *Winfield* Evidence

Jenkins and Bates assign error to the trial court's exclusion of evidence that Warren had engaged in five other shootings around the same time as the charged crimes.  In each case, judging from admissions he made in unrelated proceedings, Warren was acting alone or with accomplices other than a defendant here and "for his own reasons" unrelated to the TPC/TSC feud, and more than once using a firearm "focused upon by the government as [a] tool[] of [the] Todd Place [Crew]" (Brief for Jenkins at 38).  Their argument that this evidence should have been admitted under *Winfield v United States*, 676 A.2d 1 (D.C. 1996) (en banc), or as "reverse *Drew* evidence,"[9] *see Newman v. United States*, 705 A.2d 246 (D.C. 1997), did not impress the trial judge and does not persuade us.

The argument is essentially that Warren was a serial, free-lance shooter needing no motive tied to the shooting of TPC leader Foster or help from TPC

_____

(…continued)

to show that evidence of drug-dealing assumed any place at all in the jury's evaluation of the charges involving murder and other crimes of violence.

[9] *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964).

members for his depredations – both facts supporting a reasonable inference that he did the Gary English and Antonio Ingram shootings alone or with confederates other than Jenkins or Bates. But, as Judge Leibovitz recognized, those same facts (as well as Warren's use elsewhere of the gun he was shown to have used in shooting Ingram) squared entirely with his having acted with the defendants here in the two shootings alleged. Nothing in Jenkins' proffer to the judge about Warren's accomplices elsewhere identified them *rather than* Jenkins and Bates (and Anderson) as his confederates in the April 15 and May 10 shootings; nor was anything in his demonstrated proclivity to shoot people "for his own reasons" inconsistent with his having joined with fellow TPC members on these occasions to avenge Foster's death.

Third-party perpetrator evidence offered under *Winfield* must "tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense." *Bruce v. United States*, 820 A.2d 540, 543 (D.C. 2003) (quoting *Winfield*, 676 A.2d at 4). Even then the judge may exclude the proffered evidence if it is, *inter alia,* "too speculative with respect to the [alleged] third-party[] [perpetrator's] guilt" instead of the defendants'. *Resper v. United States*, 793 A.2d 450, 460 (D.C. 2002) (internal quotation marks omitted). The

trial judge correctly reasoned that "the fact that Mr. Warren . . . shot at other people with combinations of people who were not Mr. Jenkins or any other charged defendant or by himself or for reasons unrelated to the conspiracy does not . . . logically advance the proposition that Mr. Jenkins did not commit . . . the [Ingram] shooting . . . or other [crimes alleged] in this case."[10]  And the proffered facts of the other shootings likewise shared no motive or *modus operandi* similarity with the charged ones enough to make them plausible candidates for "reverse *Drew*" admissibility.  *See Newman*, 705 A.2d at 256-57.  The judge thus properly exercised her discretion in refusing to let the jury draw speculative inferences from Warren's violent proclivity, linked to the charged crimes by nothing more than contemporaneity and his use of "tools of Todd Place" to practice those instincts elsewhere.

## IV.   Admissibility of Recorded Jail Telephone Conversations

### A.  The Harvey/Watkins Calls

---

[10]  *See, e.g.*, *Gethers v. United States*, 684 A.2d 1266, 1271 (D.C. 1996) ("[T]he defense must establish a reasonable possibility that an actual person other than the defendant committed the crime or was otherwise responsible for it, not just a hypothetical, unidentified person who may have had a motive.").

As related at the outset, insider Davenport gave important testimony for the prosecution describing the existence and motives of the Todd Place Crew including appellants at the relevant times, in particular their angry reaction to Foster's murder and plan to retaliate against those held responsible, the TSC. The government sought to corroborate Davenport's testimony partly by recorded conversations between unindicted co-conspirator Andre Harvey, in jail at the time, and Ismail Watkins, also a member of the TPC, that discussed the Foster shooting, Gary English's resulting murder, additional actions Harvey might take inside jail as further retaliation, and generally the current "score" of violence between the rival crews stemming from the Foster killing and other "beefs." The trial judge examined transcripts of the proffered recordings and admitted some conversations as statements by co-conspirators in furtherance of the alleged conspiracy. The statements, she explained, involved "members of the conspiracy talking about the events on the outside, the violent events that . . . are the charged events in this case" – *i.e.,* the "events comprising [Foster's] death and other[s] . . . that are the beef between Todd Place and T Street" – "and plotting revenge, plotting acts against other T Street members both in jail and outside and keeping each other abreast of the events going on, both inside and outside the jail."

Appellants Jenkins and Bates dispute the admissibility of the statements, contending that "a lot of" what Watkins reported to Harvey, and vice-versa, was "simple gossip" reporting events of which neither speaker had "direct knowledge," so that much of their conversations was "double hearsay" with no foundation laid for the first "level" – the unwitnessed accounts, for example, of "the April 18 bailout [near the cemetery], including who ran and who got away" (Brief for Jenkins at 39).[11]

These appellants rightly do not dispute the general principle that statements by co-conspirators among themselves during and in furtherance of a conspiracy are admissible as non-hearsay. *See Butler v. United States*, 481 A.2d 431, 439 (D.C. 1984) (adopting Fed. R. Evid. 801 (d)(2)(E)). Nor do they question the evidence of Watkins' and Harvey's involvement in the alleged TPC conspiracy. Although appellants are right that the "in furtherance of" requirement is intended to "exclu[de] . . . statements that were casual conversation, idle gossip, or mere narratives of past events," (*Brian*) *Williams v. United States*, 655 A.2d 310, 313

---

[11] It might be thought unnecessary to consider this issue given the jury's acquittal of appellants of conspiracy and rejection of vicarious liability, but appellants argue that the conversations were also prejudicial on the issue of retaliatory motive to commit the substantive crimes.

(D.C. 1995), ample authority supports the admission of statements "made [*inter se*] to keep conspirators abreast of an ongoing conspiracy's activities . . . ." *United States v. Yarbrough*, 852 F.2d 1522, 1535-36 (9th Cir. 1988); *see United States v. Tarantino*, 846 F.2d 1384, 1412-13 (D.C. Cir. 1988) (statements by conspirator detailing drug transactions and profits to participant in conspiracy were not "mere narrations" of remote events but rather statements close in time to the transactions that helped keep co-participant current on status of the conspiracy, hence were in furtherance of it).[12]

So long as statements further the conspiracy's goals in this sense, courts considering the issue have rejected "double hearsay" or lack-of-personal-knowledge objections to their admission. *See United States v. McLernon*, 746 F.2d 1098, 1105-06 (6th Cir. 1984) ("Rule 801 (d)(2)(E) . . . exempts co-conspirator's statements from the hearsay rule. The requirement that the declarant have personal knowledge of his statements in such a case is waived."); *United States v. Ammar*,

_____

[12] And *see United States v. McKay*, 431 F.3d 1085, 1094 (8th Cir. 2005) (statement that was made to keep co-conspirator abreast of changes in the conspiracy that had taken place while he was in prison was a statement in furtherance of the conspiracy); *United States v. Roberts*, 14 F.3d 502, 515 (10th Cir. 1993) ("Statements made . . . to keep co-conspirators abreast of an ongoing conspiracy's activities satisfy the 'in furtherance'. . . requirement [under Rule 801 (d)(2)(E)."] (internal citation omitted)).

714 F.2d 238, 254 (3d Cir. 1983) (the drafters of the federal co-conspirator rule did not intend "the personal knowledge foundation requirement of Rule 602" to apply to "admissions (including co-conspirator statements) admissible under Rule 801 (d)(2)"); *United States v. Cogwell*, 486 F.2d 823, 832 n.5 (7th Cir. 1973).

Having satisfied herself as a preliminary matter of the existence of the conspiracy and the participation of Watkins and Harvey in it, the trial judge properly exercised her discretion in admitting their statements keeping one another abreast of the TPC's completed or planned retaliatory acts as well as efforts (such as the April 18 jettisoning of the guns) designed to cover the crew's tracks.

## B. The Anderson/Jenkins Calls

Bates argues that the procedures the police used to have Davenport identify the voices heard in recorded jail telephone calls, particularly Anderson's and Jenkins' voices, were unnecessarily suggestive. *See Stovall v. Denno*, 388 U.S. 293, 302 (1967). Metropolitan Police Department (MPD) Officer Habeebullah testified that she had listened to the recordings with Davenport, and when he was

able to identify voices he recorded the results on voice-identification sheets that she and Davenport signed.

Bates' undue suggestivity argument stems from the detective's acknowledgment on cross-examination that the names at least of Anderson and Jenkins had been typed at the bottom of the voice identification sheets before they were handed to Davenport. Neither Bates, however, nor any other defendant made a suggestivity objection in the trial court, so our review on the point is for plain error. *See* Super. Ct. Crim. R. 52 (b); *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). At most the detective's testimony about the sequence of these events is ambiguous,[13] and appellants thus cannot show "obvious" error in the judge's admission of the identifications. *Olano*, 507 U.S. at 734. Moreover, since the record shows that

---

[13] A. Well, before he [Davenport] saw the sheet he said the name of the person. So that wasn't suggestive. He supplied me the names first before he wrote this name on this piece of paper.

Q. But you had already handed him the piece of paper as you've already told us and right on the piece of paper its says Boogie [Jenkins] and Peanut [Anderson] continue their conversation, right?
A. Correct.
Q. So he was filling out this paper, as he listened to the tapes, right?
A. Yes.

Davenport had known Anderson and Jenkins for years, appellants are equally hard-pressed to dispute that the voice identifications, suggestivity aside, were reliable in all the circumstances. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

### V.      The Prosecutors' Closing Arguments

Appellants assert multiple claims of impropriety by the two prosecutors in their initial closing and rebuttal arguments. None requires reversal, we hold, particularly in view of corrective instructions the judge gave. We briefly discuss three instances.[14] The first, already addressed earlier, concerns the unsubstantiated "possibility" the prosecutor suggested that "somebody leaned on" Warren to exculpate the other defendants. The judge's immediate contrary instruction rectified that misstatement.

Before trial the judge directed the government to "sanitize" the evidence of the three guns being tossed into Mount Olivet Cemetery on April 18, to omit all

---

[14] We do not discuss, but reject as forming any basis for reversal, the claims of impropriety – or at least rhetorical excess – that Bates makes regarding the prosecutor's opening statement. We likewise reject as requiring no discussion Jenkins' argument of unfair limitations imposed on his own opening statement and closing argument.

reference to an uncharged shooting on that day. In his closing, though, after discussing the physical evidence recovered on April 18, the prosecutor stated, "Let's go back to a week earlier now. What happened on April 18th was repeated a week earlier on April 11, 2008." He then began discussing the April 11 shooting of Dante Vaughn, of which all defendants were ultimately acquitted. And he further mentioned Davenport's testimony about how the Todd Place Crew "rode around drinking and smoking [on] Friday nights, looking for a T Street member to shoot." On Anderson's objection, the trial judge told the prosecutor "don't do that anymore," and instructed the jury that she was "striking the last remarks by the prosecutor" and that "there is no evidence in this trial that anyone was riding around on April 18th in the Grand Marquis, drinking, smoking, [or] looking for anyone to shoot or shooting."

Even if "complained-of language [in closing is] impermissible, we nonetheless must affirm [the] appellant's conviction unless he can demonstrate substantial prejudice as a result of the prosecutor's error." *Harrison v. United States*, 76 A.3d 826, 844 (D.C. 2013) (citation and internal quotation marks omitted). Beyond the general instruction the jury received that the arguments of counsel are not evidence, the judge specifically acted to neutralize the prosecutor's

suggestion – an oblique one in any case – that Anderson and the others had fled the police on April 18 because they had shot someone else that day or had been riding around with that in mind. "So long as . . . unproduced evidence is 'not touted to the jury as a crucial part of the prosecution's case,' a limiting instruction from the trial court is usually a sufficient cure for any possible prejudice." *Bailey v. United States*, 831 A.2d 973, 981-82 (D.C. 2003) (quoting *Frazier v. Cupp*, 394 U.S. 731, 736 (1969)). As our discussion in part II shows, the evidence linking appellants – Anderson included – to the charged crimes motivated by retaliation was substantial, and the discrimination shown by the jury in rendering verdicts belies the argument that it was unable to follow the instructions and disregard an allusion to uncharged shootings.

Finally, we consider the prosecutor's argument in rebuttal – potentially the most troublesome one – dealing with exculpatory testimony given by Raymond Devese, who had witnessed the shooting of Gary English (and John Green) and, as we have pointed out, identified Bates as the driver of the white car. Devese testified on cross-examination by Anderson that when MPD Detective Anthony Greene showed him an array of photographs including one of Anderson, he told Greene, "He's not on here," meaning "none of the people in the pictures were a

person [he] saw in the white vehicle." In his rebuttal argument, however, after repeating Devese's testimony to Detective Greene that "he's not here," the prosecutor stated, "What was the question [that Greene asked]? What did Detective Greene tell you was the question? The question was who was the driver? Well, of course, it wasn't Darnell Anderson, it was James Bates." Anderson objected to this argument, and Judge Leibovitz, after reviewing the transcript of Detective Greene's testimony, found that the prosecutor's "recitation was incorrect" and that Greene "did not testify at all [about] what question Mr. Devese was asked when shown the photographs."[15] After consulting with the parties, the judge instructed the jury:

> Government counsel stated in rebuttal closing argument that Raymond Devese when shown photographs, including one of Darnell Anderson, was asked the question whether he saw the driver of the car. There is no evidence in the record of this case that when shown photographs, Mr. Devese was asked if he saw the driver of the car. There is evidence in the case that Raymond Devese was asked whether he saw anyone in the car. There also was no testimony from Detective Greene regarding what question was asked. It is up to you to decide whether to accept this evidence.

---

[15] The prosecutor acknowledged at a bench conference that he had mistakenly remembered the question asked of Devese.

Anderson, besides insisting to the judge, unsuccessfully, that only a mistrial could remedy the prosecutor's misstatement, asked her to strengthen the proposed instruction by adding to it that "[t]here is no testimony from Detective Greene that contradicts Devese's testimony." The judge declined, and he challenges both aspects of her ruling here. Anderson is certainly right that Devese's testimony was important to his effort to create reasonable doubt about his involvement in the English shooting; and equally right that the misstatement in rebuttal denied him the ability to re-argue the testimony accurately to the jury. We nonetheless do not agree that no curative instruction could serve to neutralize the prosecutor's misstatement or that the instruction given failed that task. The prosecutor misstated the evidence on a single point – whether a specific question by Greene had elicited Devese's denial of seeing Anderson in the car – that the judge concluded could be remedied by setting the record straight. Our decisions commit this kind of judgment substantially to the discretion of the trial court, since it is "peculiarly within the knowledge of the trial judge whether the remarks of counsel during the trial tend to prejudice the cause of a party." *Irick v. United States*, 565 A.2d 26, 32 (D.C. 1989) (citation omitted). After presiding over a more than two-month trial enabling her to assess the issues likely to occupy the jury's deliberations, Judge Leibovitz reasonably determined that an instruction could

forestall misunderstanding by the jury of the evidence on this issue of what Devese had been asked.

Nor did the instruction given imply, as Anderson suggests it did in the final sentence, that the jury "could reject Devese's testimony and accept the prosecutor's word about what Detective Greene had actually asked" (Brief for Anderson at 36). The jury was told that, contrary to the prosecutor's assertion that the detective had asked Devese only "whether he saw the driver," there "was evidence that Raymond Devese was asked whether he saw anyone in the car," "no evidence" that he "was asked if he saw the driver of the car," and "no testimony from Detective Greene regarding what question was asked." The final sentence ("It is up to you to decide whether to accept this evidence"), which essentially reminded the jury of what the general instructions had told it ("You are the sole judges of the facts.") did not undo all the judge had just told the jury and invite it to "accept the prosecutor's word." If the jury nonetheless did not credit Devese's testimony, or took it as insufficient to exculpate Anderson of the English murder, that was owing not to a misstatement of the evidence or an instruction that failed to cure it, but to the formidable evidence otherwise of Anderson's guilt, including his arrest while complicit in trying to get rid of and conceal the murder weapons.

## VI.    The "Criminal Street Gang" Instruction

Like the other appellants, Warren was convicted of "criminal street gang" charges corresponding to each of his other convictions, *i.e.*, obstruction of justice and carrying a pistol without a license (CPWL). The government concedes that, with the failure on review of the former conviction, see note 1, *supra*, only Warren's street gang conviction predicated on the CPWL conviction is at issue. Although the street gang statute is new in this jurisdiction and has not been construed or applied before by this court, Warren, joined by other appellants who adopt his argument, contests only the trial court's refusal to give a special unanimity instruction on a main component of the statute.

As relevant here, D.C. Code § 22-951 (b)(1) makes it an independent crime for any person "who is a member of or actively participates in a criminal street gang to knowingly and willfully participate in any felony or violent misdemeanor committed for the benefit of, at the direction of, or in association with any other member or participant of that criminal street gang." Warren argues that the trial judge erred in refusing to instruct the jury that it had to agree unanimously on whether he committed the underlying crime "for the benefit of" or, instead, "in

association with" another gang member or participant. (With the parties' agreement, the judge omitted "at the direction of" from the alternatives, as no evidence pointed to such "direction" regarding any of the § 22-951 (b)(1) charges). The argument is without merit.

Section 22-951 (b)(1)'s purpose on its face is to deter membership or participation in a "criminal street gang," defined elsewhere as "an association or group of 6 or more persons" having, in part, "as one of its purposes or frequent activities, the violation of the criminal laws of the District . . . or the United States . . . ." Section 22-951 (c)(1)(B). The statute carries out that deterrent aim by punishing separately – in effect, enhancing punishment for – a gang participant's commission of a felony or violent misdemeanor,[16] but with an important qualification. A crime that *happens* to have been committed by a gang participant falls outside of the statute's reach. To be punishable under it, the crime must be linked to the defendant's participation in the street gang by being done in one of three ways: for the benefit of the gang (by a defendant acting alone), or at the direction of or, at least, in association with another gang participant. Any of these

_____

[16] Section § 22-951 (e)(2) defines "violent misdemeanor" to include, among other things, simple assault and possession of a prohibited weapon.

ways of committing the crime satisfies the required link – the gang-relatedness – between the defendant's participation in the street gang and commission of the predicate crime.

Our decisions do not demand a special unanimity instruction for these separate ways or means. An instruction requiring more than general unanimity in the verdict is necessary when a single charge "encompasses two separate incidents," requiring the jury to "be unanimous as to which incident or incidents they find the defendant guilty [of]." *Scarborough v. United States*, 522 A.2d 869, 871 (D.C. 1987) (en banc) (citation omitted). The instruction "should be given when distinct incidents go from being different means of committing the same crime to being different crimes." *Hagood v. United States*, 93 A.3d 210, 217 (D.C. 2014) (citation and internal quotation marks and brackets omitted). In (*David*) *Williams v. United States*, 981 A.2d 1224, 1229 (D.C. 2009), the court drew "helpful guidance" from the Supreme Court's analysis in *Richardson v. United States*, 526 U.S. 813 (1999), "for determining when that point of demarcation is reached." The Court there explained that the "jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to

commit an element of the crime." *Id*. at 817. The question becomes "whether the statute's [language] . . . refers to one element, . . . in respect to which the [listed possibilities] constitute the underlying brute facts or means, or whether those words create several elements, in respect to *each* of which the jury must agree unanimously and separately." *Id*. at 817-18 (emphasis in original).

The separate ways by which § 22-951 (b)(1) links the commission of an underlying crime to street gang participation are not separate elements of the street gang offense, but only different means by which the predicate crime may be shown to stem from the defendant's participation in a gang rather than just being coincidental or fortuitously connected with it. Appellants' view that the alternatives are indeed elements would force a jury to distinguish unanimously, say, between a defendant's acting "for the benefit of" the gang and acting "in association with" other gang members, a distinction that has no point when the obvious effect of either is the same: to further the gang's criminal objectives. The Sixth Amendment does not require unanimity on subsidiary ("brute") factual issues such as these, and the trial judge correctly refused to instruct the jury otherwise.

## VII.   Adult Sentencing of Warren

Warren, who was age 16 when indicted, argues that under the governing statute he could not be sentenced as an adult because, though charged with multiple violent crimes including murder, he was convicted only of obstructing justice, CPWL, and corresponding street gang offenses.[17]  We have not opined on this issue of interpretation before, but conclude that the plain language of D.C. Code § 16-2301 (3) defeats Warren's argument.

The Family Court of the Superior Court generally has exclusive jurisdiction over a "child" accused of committing a delinquent act that would be considered a crime if committed by an adult.  D.C. Code § 11-1101 (13); *see*, *e.g.*, *United States v. Hobbs*, 594 A.2d 66, 67 (D.C. 1991).  Chapter 23 of Title 16 of the Code, however, allows for certain juveniles to be prosecuted as adults in the Criminal Division when the United States Attorney, in his discretion, decides to prosecute as an adult a 16- or 17-year-old who is "charged with" one or more serious crimes enumerated in D.C. Code § 16-2301 (3).  That section provides:

---

[17]   As noted previously, the obstruction count and related street gang conviction predicated on it must be vacated on remand.  See note 1, *supra*.

(3) The term "child" means an individual who is under 18 years of age, except that the term "child" does not include an individual who is sixteen years of age or older and –

(A) charged by the United States Attorney with (i) murder, first degree sexual abuse, burglary in the first degree, robbery while armed, or assault with intent to commit any such offense, or (ii) an offense listed in clause (i) and any other offense properly joinable with such offense;

(B) charged with an offense referred to in subparagraph (A)(i) and convicted by plea or verdict of a lesser included offense; or

(C) charged with a traffic offense.

Warren does not dispute that the crimes he was convicted of were "properly joinable" with the enumerated crimes in subsection (3)(A)(i). But he argues that once he was acquitted of all enumerated crimes and lesser offenses included in them, nothing remained for the conviction-crimes to be "join[ed]" with, and as free-standing convictions they could not support continued adult jurisdiction over him through sentencing.

By its terms, however, § 2301 (3) makes being "charged with" particular crimes, not "convicted of" or "charged with and convicted of" them, the basis for criminal prosecution of what otherwise would be a child. In only one instance does the section look beyond the charging decision to the result of prosecution by

"convict[ion]" and (implied) acquittal, and that is as to lesser-included offenses of the enumerated crimes, where a defendant would not normally, and certainly not invariably, be "charged with" the included crime expressly. In enacting § 16-2301 (A) Congress[18] must be assumed to have chosen its words deliberately, and its focus on being "charged with" as the operative jurisdictional event speaks plainly as to its intent. 3A SUTHERLAND STATUTORY CONSTRUCTION § 72:3 (7th ed.) ("Courts assume that every word, phrase, and clause in a legislative enactment is intended and has some meaning and that none was inserted accidentally"). Warren's contrary argument that conviction for a (3)(A)(i) or (B) offense is necessary for a properly joined conviction-crime to be punished can point to nothing in the statute's text other than a pairing – "an offense listed in clause (i) *and* any other offense" – expressly made part of the act of being "charge[d]."

By denying properly joinable offenses any independent role in whether adult jurisdiction can be maintained through sentencing, moreover, Warren's reading of the statute leads to a strange result. While convictions for, say, the lesser-included offenses of simple assault or unlawful entry, both misdemeanors, suffice to allow

---

[18] Section 16-2301 was enacted by Congress in 1970 as part of the District of Columbia Court Reorganization Act. *See Pendergrast v. United States*, 332 A.2d 919, 923 (D.C. 1975).

criminal punishment, conviction alone for major joined offenses such as aggravated assault, carjacking, conspiracy, or serious firearms offenses means loss of criminal jurisdiction and transfer of the defendant for juvenile treatment. That would be a tolerable and even necessary result if the statute reasonably read supported it, because § 16-2301 (3)(A) must be construed strictly against charging 16- or 17-year-olds criminally as adults. *See United States v. Tucker*, 407 A.2d 1067, 1070 (D.C. 1979). And the result would likewise be dictated, as Warren urges, by principles of lenity if § 2301 (3)(A) were ambiguous and we were uncertain of the intent the legislature expressed. *See Logan v. United States*, 483 A.2d 664, 676 (D.C. 1984). But Warren has directed us only to a statutory link between enumerated and joined offenses that Congress expressly made a function of charging, not conviction or acquittal. On his acquittal of the enumerated crimes Warren was indeed not "charged with" them, just as on conviction he was not "charged with" the joined offenses, but only because the prosecution had moved beyond that stage to verdict. At the relevant time he was charged with crimes in both categories, and thus remained subject to criminal jurisdiction through sentencing.

## VIII. Merger of Convictions

Finally, Anderson contends that his multiple street gang convictions for the April 15 shootings of Gary English and John Green should be merged into one, and the case remanded for resentencing to that limited extent. The government concedes that some of these convictions merge, but not all. It argues, for example, that because Anderson's predicate convictions for the murder of English and the assault with a dangerous weapon (ADW) on Green do not merge, *see Black v. United States*, 755 A.2d 1005, 1009 (D.C. 2000), the two corresponding street gang convictions do not merge. Anderson responds that in the analogous situation of multiple charges of possession of a firearm during a crime of violence (PFCV) predicated on crimes that themselves did not merge, we have required merger where the underlying crimes "were common to a single violent act and overlapped substantially." *Hagood*, 93 A.3d at 226 (involving predicate crimes of burglary and ADW); *see also Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999) (merger of PFCV convictions required where predicate convictions – four separate counts of assault with intent to commit murder – resulted from the defendant's shooting into a car containing several individuals).

We find Anderson's analogy persuasive. The shooting of English and Green undeniably involved "a single violent act" and facts that "overlapped substantially," as Anderson and Jenkins fired multiple shots in rapid succession from the car. We conclude that, as with the unitary possession of a firearm in *Hagood* and *Nixon*, Anderson's street gang "participat[ion]," D.C. Code § 22-951 (b)(1), in shooting English and Green was "a 'continuous whole,'" *Hagood*, 93 A.3d at 226 (quoting *Matthews v. United States*, 892 A.2d 1100, 1107 (D.C. 2006)), which lenity dictates should subject him only *once* to criminal street gang punishment for the April 15 events. The same logic applies to Jenkins' and Bates' conduct – each is subject to only a single street gang conviction for the April 15 events.[19] We reach the same conclusion as to Bates' seven street gang convictions based on the May 26 shootings of Chaquon Wingard and Ricardo Russell, where each predicate conviction arose from the same single, continuous violent act, and as to Jenkins' two street gang convictions for the May 10 events, where the two predicate weapons offenses arose from a single act of possession. For each of these events, only one street gang conviction per defendant may stand.

---

[19] Both Jenkins and Bates have explicitly adopted Anderson's merger arguments. Warren now stands convicted of only a single street gang count predicated on a CPWL charge, and has no need of these merger claims.

The government agrees that the PFCV and corresponding street gang convictions of each defendant merge, so we need not discuss them.[20] On remand, the parties should inform the trial court accordingly, so that it may conduct the necessary limited re-sentencing. In all other respects, the convictions of all of the appellants are

*Affirmed.*

---

[20] Although the concession is only explicit as to Anderson and Bates, the same analysis applies to Jenkins.